**CONWED CORPORATION, Plaintiff,**

v.

**NORTENE, S.A., et al., Defendants.**

**No. 4–74–Civ. 20.**

United States District Court,
D. Minnesota,
Fourth Division.

Sept. 9, 1975.

Frank Hammond, David C. Forsberg, R. L. Sorenson, Briggs & Morgan, St. Paul, Minn., for plaintiff; William D. Lucas, David L. Just, Eyre, Mann & Lucas, New York City, of counsel.

Edward C. Cerny III, William E. Kelly, Casey, Lane & Mittendorf, New York City, Mark P. Kovalchuk, Van Valkenburg, Comaford, Moss, Fassett, Flaherty & Clarkson, Minneapolis, Minn., for Nortene and Netlon.

James B. Vessey, Dorsey, Marquart, Windhorst, West & Halladay, Minneapo-

lis, Minn., for Societe Generale Alimentaire.

## MEMORANDUM ORDER

LARSON, District Judge.

Plaintiff Conwed Corporation seeks a declaratory judgment concerning the validity, infringement, and licensing of certain patents used in the manufacture of plastic net. One of the three defendants, Societe Generale Alimentaire (hereinafter Alimentaire), has conceded by stipulation that this Court has personal jurisdiction over it. The other two defendants, Nortene and Netlon, have moved to dismiss the action against them for lack of personal jurisdiction, insufficiency of process, and insufficiency of service of process. Oral argument was heard on the motions on April 10, 1975, and the parties have extensively briefed the issues. For the reasons set forth herein, the Court will grant the motions of defendants Nortene and Netlon to dismiss the action.

The allegations of the complex complaint are summarized in an earlier Order of this Court, dated September 11, 1974. The following narrative will provide sufficient background for the jurisdictional motions. In approximately 1961, Jacques Hureau, while employed by Nortene in France, invented a process for the manufacture of plastic net. Hureau did not inform his employer of the invention, but made a deal for his personal benefit with Alimentaire. Through this arrangement Alimentaire obtained French patents on the process and, by means of international treaties, obtained satellite patents in other countries, including the United States. These patents will be collectively referred to as the Hureau patents.

In 1966 Alimentaire granted to Conwed an exclusive license to use the invention in the United States. At approximately the same time, Nortene discovered that Hureau had made the invention while in its employ. Accordingly, in 1967 Nortene brought an action in the French courts against Hureau and Alimentaire, contending that it was the true owner of all rights under the Hureau patents. In early 1971 Nortene prevailed in the Court of Appeals of Paris, and that judgment was affirmed by the Court of Cassation—France's highest court—in January of 1973. The French courts ordered Alimentaire to assign to Nortene all patents, foreign and domestic, which stemmed from the Hureau invention.[1] The courts further ordered Alimentaire to cancel all licenses with its foreign licensees, including Conwed. In a decree dated September 25, 1974, the Court of Appeals of Paris held that an assignment of the United States patents, tendered to Nortene on March 15, 1974, constituted full compliance with the French judgment. Since that proferred assignment provided that it was subject to any rights of Conwed which would be determined in the United States District Court for the District of Minnesota, the French courts have deferred to this Court on the question of whether Conwed retains any rights under its license.

Meanwhile, within a few weeks of the first decision of the Paris Court of Appeals, Nortene's solicitors had written to Conwed's offices in St. Paul, Minnesota, on June 30, 1971 [the June 1971 letter], enclosing a copy of the court decision and directing attention to the portion directing cancellation of the Conwed license. In October of 1971 a meeting was held in London at which representatives of Nortene and Netlon advised Conwed that the latter could obtain a license under the Hureau United States patents for one million dollars. Further

---

1. There is a dispute among the parties as to whether the patents have ever been assigned to Nortene in accordance with the French decree. The plaintiff contends that the assignment has been completed; the defendants deny this. The Court does not find the proper resolution of this dispute to be germane to the jurisdictional issue, and has proceeded on the assumption that the assignment has been completed, constructively or otherwise.

discussions were held between the parties in September of 1972 at Blackburn, England. On October 19, 1972, a letter from Nortene's solicitor to Conwed [the October 1972 letter] declared that since Alimentaire had not been the true owner, Conwed owned nothing under the patents. The letter suggested that Nortene would take "overt steps" against Conwed once the Court of Cassation had affirmed the lower court, and concluded with the statement that if no satisfactory agreement could be reached, Nortene would commence infringement proceedings at that time.

In January of 1973 Nortene's solicitor advised Conwed of the affirmance by the Court of Cassation, and suggested a meeting with Conwed's representatives in St. Paul, Minnesota. That meeting was held in St. Paul in March of 1973, and was continued in New York. Various possibilities for settling the matter were discussed. During the course of the meetings representatives of Conwed requested Nortene to put its demands in writing so that they could consult with French counsel to get an opinion on the liability of Alimentaire. Nortene complied with this request in a letter dated March 13, 1973. The March 1973 letter declared:

" . . . Unless you close down immediately your manufacturing and marketing operations in these products Patent infringement proceedings

will immediately be commenced against you and pursued vigorously and with all possible speed . . . ."

Conwed commenced this action on January 10, 1974, seeking a declaration that it has a right to an execlusive license under the Hureau United States patents, that the Hureau patents obtained in the United States are invalid, or that its manufacturing processes do not infringe the Hureau patents. It is undisputed that neither Nortene nor Netlon maintains or has ever maintained any place of business in the United States. As nonresident defendants they were served by (1) personal service of the Summons and Complaint pursuant to M.S.A. § 543.19 Subd. 2; (2) filing in the office of the Minnesota Secretary of State pursuant to M.S.A. § 303.13 Subd. 1(3); and (3) registered mail pursuant to Rule 4(i)(D) of the Federal Rules of Civil Procedure. The latter mode of service is permitted only where there is independent authority under Federal or State law to assert jurisdiction over the foreign party. Therefore, this Court's power to assert *in personam* jurisdiction over Nortene and Netlon is dependent on the reach of M.S.A. §§ 303.13 [2] and 543.19 [3], as circumscribed by the due process clause of the Constitution.

A plaintiff in a Federal District Court may, of course, avail itself of the "long-arm" statutes of the State

---

2. Section 303.13 Subd. 1(3) of the Minnesota statutes provides in relevant part:

"If a foreign corporation makes a contract with a resident of Minnesota to be performed in whole or in part by either party in Minnesota, or if such foreign corporation commits a tort in whole or in part in Minnesota against a resident of Minnesota, *such acts shall be deemed to be doing business in Minnesota* by the foreign corporation and shall be deemed equivalent to the appointment by the foreign corporation of the secretary of the state of Minnesota and his successors to be its true and lawful attorney upon whom may be served all lawful process in any actions or proceedings against the foreign corporation arising from or growing out of such contract or tort. . . . " [Emphasis supplied.]

3. Section 543.19 Subd. 1 provides in relevant part:

"As to a cause of action arising from any acts enumerated in this subdivision, a court of this state with jurisdiction of the subject matter may exercise personal jurisdiction over any foreign corporation or any non-resident individual, or his personal representative, in the same manner as if it were a domestic corporation or he were a resident of this state. This section applies if, in person or through an agent, the foreign corporation or non-resident individual:

(a) Owns, uses, or possesses any real or personal property situated in this state, or

(b) Transacts any business within the state . . . ."

in which the court sits in order to obtain *in personam* jurisdiction over a defendant. *See* Federal Rule of Civil Procedure 4(e) and (f); *United States v. First National City Bank,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *S. S. Kresge Co. v. Kamei-Autokomfort,* 363 F.Supp. 257, 258 (D.Minn.1973). And, constitutional limitations aside, the reach of State long-arm statutes is a question of State law, to be decided by the highest court of the State. The Minnesota Supreme Court has specifically stated that, in enacting the long-arm statutes, the legislature intended "to extend the extraterritorial jurisdiction of [the State's] courts to the maximum limits consistent with constitutional limitations." *Hunt v. Nevada State Bank,* 285 Minn. 77, 172 N.W.2d 292, 304 (1969), *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970). Accordingly, the Federal courts have recognized that both M.S.A. § 303.13 and § 543.19 are to be read expansively. *See, e. g., B & J Manufacturing Co. v. Solar Industries, Inc.,* 483 F.2d 594, 597 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); *Williams v. Connolly,* 227 F. Supp. 539, 542 (D.Minn.1964). However, the burden is on the plaintiff, when challenged, to prove that it has obtained *in personam* jurisdiction over the defendant. *See Thompson v. Kiekhaefer,* 372 F.Supp. 715, 720 (D.Minn.1973); *McQuay, Inc. v. Samuel Schlosberg, Inc.,* 321 F.Supp. 902, 904 (D.Minn.1971).

The plaintiff urges that the requirements of one or both of the Minnesota long-arm statutes are met under any one of four theories. First, it urges that the French judgments require Nortene to assume the obligations of Alimentaire arising from the licensing agreement between Conwed and Alimentaire. Second, it contends that there is a series of contracts between itself and duPont, duPont and Netlon, and Netlon and Nortene which, when linked together to form a chain, provides that Conwed is to be granted exclusive rights under the Hureau United States patent; it seeks to sue directly as third party beneficiary of contracts entered into by Nortene and Netlon. Third, it claims that the conferences between Nortene and Netlon, on the one side, and the plaintiff, on the other side, constitute the "transaction of business" in Minnesota. Fourth, it argues that Nortene's assertion of patent rights against the plaintiff constitutes the use or possession of personal property in Minnesota. The Court has concluded that the Minnesota long-arm statutes do not support jurisdiction under the first three theories, and that to assert jurisdiction under the fourth theory would violate due process.

I. *The "Burden of the French Judgment" Theory—*

■ The plaintiff first claims that since Nortene became assignee of the Hureau patents from Alimentaire under the French decree, Nortene stands in the shoes of its assignor (Alimentaire), and must take the burdens along with the benefits, including the assignor's conceded amenability to personal jurisdiction in Minnesota. The Court cannot agree, for it believes that the plaintiff's argument stems from a fundamental misunderstanding of what was ordered in the French decree.

It must be obvious even to the plaintiff that the original decree entered by the French courts had precisely the opposite effect, for it ordered Alimentaire to cancel all of its outstanding licenses. The assignment contemplated by the French courts was thus explicitly *not* to be burdened by outstanding obligations of Alimentaire, including the Conwed license. The subsequent decree of the Court of Appeals of Paris, approving the form of an assignment which had been tendered by Alimentaire to Nortene, did not constitute a complete reversal, as the plaintiff would have this Court believe; the approved form of assignment did not require Nortene to honor the licensing agreement between Alimentaire

and Conwed. Rather, the assignment provided that it was subject to the rights of Conwed to be determined in the future by this Court. Thus, if Conwed is to retain any rights whatsoever in the Hureau patents, it will not be by virtue of any burdens imposed upon Nortene by the French courts, but will be by virtue of some independent legal· ground as determined by this Court. In sum, the French courts have not concluded or decreed that Nortene stands in the shoes of Alimentaire with respect to the Conwed licensing agreement.

Turning to the law by which the plaintiff hopes to prevail on the merits in this Court, the only theory of the case advanced by plaintiff is that the plaintiff, as the bona fide purchaser for value of the Hureau United States patent rights,[4] cuts off any rights which were held by the true owner of the patent (Nortene). *Cf., Heywood-Wakefield v. Small*, 96 F.2d 496 (1st Cir.), *appeal dismissed*, 305 U.S. 663, 59 S.Ct. 54, 83 L.Ed. 430 (1938), cited by the plaintiff in support of this theory. Without belittling the merits of this contention, it should be obvious that this view of the law is not sufficient to create *jurisdiction* in this Court. The effect of the bona fide purchaser for value rule is that the bona fide purchaser becomes immune from suit by the true owner; the rule is not bottomed on some estoppel notion that the true owner is bound by the representations and promises of the fraudulent seller. Only under the latter notion could the plaintiff reasonably argue that Nortene was somehow bound by the obligations and undertakings or the jurisdiction-creating acts of Alimentaire.

■ Thus, even accepting the plaintiff's view of the facts and the substantive law, the Court has not been presented with a basis for the assertion of jurisdiction over Nortene or Netlon. While Conwed, if a bona fide purchaser of the patent rights, might be able to use its innocent status as a shield, to cut off a suit for recovery by the true owner, Nortene, it may not use its innocent status as a sword to force the true owner to live up to the acts and promises of the fraudulent seller, Alimentaire, including the acts which render the fraudulent seller amenable to jurisdiction in Minnesota. Nor may Conwed claim that Alimentaire was somehow the agent of Nortene, for

" . . . [t]he unilateral activity of those who claim some relationship with a nonresident defendant, cannot satisfy the requirement of contact with the forum State. . . . " *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958) (interpreting a similar Florida long-arm statute).

The plaintiff has failed in its first theory to establish any statutory basis for *in personam* jurisdiction over Nortene or Netlon.

II. *The "Chain of Contracts" Theory*—

■ As set forth in greater detail in this Court's Order of September 11, 1974, the plaintiff has alleged that a series of contracts exist which, if specifically enforced, would give it the right to exclusive control and use of the Hureau patent processes in the United States. Generally, the chain is alleged to consist of the following links. First, it is contended, Nortene and Netlon have agreed in writing that any Hureau patents obtained by Nortene will be transferred to Netlon as improvements on a patent known as the Mercer patent. Second, it is claimed, Netlon has an agreement with duPont whereby Netlon

---

4. The plaintiff urges that the Alimentaire-Conwed licensing agreement was in effect an assignment of the patent rights, since it reserved to Alimentaire only the right to royalties and the right to reversion of the patents for nonpayment of royalties. *See Hook v. Hook & Ackerman, Inc.*, 187 F.2d 52, 58 (3d Cir. 1951). The Court has assumed, for purposes of the jurisdictional motions, that this contention is correct, and has further assumed that the plaintiff was a bona fide purchaser for value of the Hureau United States patent rights.

has given duPont an exclusive license under the Mercer United States patent, and duPont contends that this agreement requires Netlon to give to it an exclusive license under the Hureau United States patents whenever Netlon acquires such rights.[5] Third, if duPont acquires rights to the Hureau United States patents, it must and will turn them over to Conwed pursuant to an agreement whereby duPont licensed a patent known as the Galt patent to Conwed. In short, the plaintiff contends that duPont is the third party beneficiary of a contract between Nortene and Netlon, and the plaintiff is the third party beneficiary of a contract between Netlon and duPont. Even if the plaintiff retains no rights in the Hureau patents which had been accorded it by Alimentaire, goes the argument, it should be permitted to proceed directly against Netlon and Nortene to assert its contractual right to the patents.

As with the first theory of judisdiction, although the merits of the plaintiff's contentions may be sound, the plaintiff has overlooked the fact that there is no Minnesota long-arm statute which will support jurisdiction, even assuming that a chain of contracts exists precisely as described by the plaintiff. M.S.A. § 303.13 Subd. 1(3) reaches only those situations where a foreign corporation *"makes* a contract *with a resident of Minnesota"* to be performed in whole or in part within Minnesota. Neither Nortene nor Netlon is alleged to have ever made any contracts with any Minnesota resident. The statute does not apply.

The plaintiff cites no authority for its proposition that the several contracts may be stitched together or "tacked" to show that the ultimate jurisdictional effect is a contract between Nortene and the plaintiff. Nor has the Court been

able to find such authority. Indeed, what authority there is points to the contrary conclusion. In *Independent School Dist. No. 454 v. Marshall & Stevens Co.,* 337 F.Supp. 1278 (D.Minn. 1971), the plaintiff sued an insurance appraiser for negligent appraisal and the defendant sought to bring in a non-resident third party defendant who had made the calculations used in the appraisal. The Court held that notwithstanding the fact that the calculations had been made for the benefit of a resident of Minnesota, the third party defendant had insufficient contacts with the State of Minnesota to permit an assertion of personal jurisdiction. This was so, even though the party invoking jurisdiction had directly contracted with the third party defendant. Applying the holding of that case to the facts here, it is apparent that even if Conwed sued duPont on the Conwed-duPont agreement, duPont could not implead Netlon, and the chain would have to be broken for jurisdictional purposes with the first defendant. *A fortiori,* Conwed cannot sue Netlon directly and its relationship with Nortene is, of course, even more removed.

Judge Neville's opinion in *S. S. Kresge Co. v. Kamei-Autokomfort, supra,* similarly rejected an attempt to forge a jurisdictional "chain" of contracts. There the plaintiff sought to sue the West German holder of a patent by asserting that its exclusive licensee, located in California, was a Minnesota "resident" for purposes of M.S.A. § 303.13 Subd. 1(3) because the licensee had transacted business in Minnesota. Judge Neville found that he had no jurisdiction over the foreign corporation under the Minnesota long-arm statutes. *Id.* at 259. There is no merit to plaintiff's second theory of jurisdiction in the case *sub judice.*

5. The defendants deny that the Netlon-du-Pont agreement covers the Hureau patents, and urge that the "chain" of contracts does not exist without this missing link. The Court has not resolved this factual issue, since it has concluded that, even if the chain is as the plaintiff describes it, no Minnesota statute confers jurisdiction on the Court.

### III. *The "Negotiations as Transaction of Business" Theory*—

■ The plaintiff's third theory of jurisdiction is that the meeting held in St. Paul and the related correspondence constituted the "transaction of business" within the meaning of M.S.A. § 543.19 Subd. 1(b). There is some dispute concerning who requested the meeting. Even assuming, however, that the meeting was held at the request of the defendants, the Court is satisfied that the settlement meeting and related correspondence did not constitute the "transaction of business" within the meaning of the Minnesota long-arm statute.

Minnesota, along with other jurisdictions, has long had a policy favoring the compromise of disputes without resort to litigation. *See, e. g., Bartels v. Schwake,* 153 Minn. 251, 252, 190 N.W. 178 (1922). The policy has led to a rule excluding the admission of evidence of such compromises, and the rationale was well stated by the Eighth Circuit in *Moffitt-West Drug Co. v. Byrd,* 92 F. 290, 292 (8th Cir. 1899):

> ". . . It is the policy of the law to favor the settlement of disputes, to foster compromises, and to promote peace. If every offer to buy peace could be used as evidence against him who presents it, many settlements would be prevented, and unnecessary litigation would be produced and prolonged. For this reason unaccepted offers to compromise claims or to purchase peace are inadmissible in evidence at the trial of controversies over the claims to which they appertain, and should not be permitted to affect the rights of the parties, or to influence the results of the trials. . . "

*Accord, Hammond Packing Co. v. Dickey,* 183 F. 977, 978 (8th Cir. 1911).

On the facts of this case, the policy favoring compromise is closely related to the courts' traditional aversion to "jurisdictional traps." Together the two policies are broad enough to preclude the use of the St. Paul settlement meeting to establish jurisdiction, and the Court is satisfied that the Minnesota Supreme Court would so interpret M.S.A. § 543.-19 Subd. 1(b).[6]

■ Even were the Minnesota statute held to reach this conduct, however, the due process clause would prohibit its application. The two touchstones for applying the due process clause in the long-arm context were repeated by this Court in *Independent School Dist. No. 454 v. Marshall & Stevens Co., supra,* at 1282:

> ". . . [I]n order for the exercise of personal jurisdiction over a nonresident defendant to comply with due process, the defendant must have had 'certain minimum contacts with . . . [the forum State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) . . . . [And,] in *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Supreme Court stated that:
>
> > '[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' 357 U.S. at 253 78 S.Ct. [1228] at 1240"

It would offend both formulations of the due process limitation to base jurisdiction over Nortene and Netlon on the St. Paul settlement meeting. As Judge

---

**6.** The plaintiff urges that business was transacted because, in the course of the discussions, the defendants proposed a settlement which would have included a joint venture between the defendants and the plaintiff. The Court has concluded that such suggestions were made in the context of settlement, for the purposes of mitigating the hardship encountered by the plaintiff in the wake of the French decree. As part of the compromise offer, it was not an independent solicitation of a business partner.

Lord stated in *Washington Scientific Industries, Inc. v. Polan Industries, Inc.*, 302 F.Supp. 1354, 1358 (D.Minn.1969):

> " . . . In the opinion of this Court, it is contrary to our 'traditional conception of fair play and substantial justice' to hold [the defendant] subject to the jurisdiction of Minnesota courts merely because it participated in a meeting in Minnesota which was designed to work out problems which had arisen in a matter which otherwise would not have subjected [the defendant] to that jurisdiction."

The Court has concluded that the St. Paul meeting and the accompanying correspondence did not constitute the "transaction of business" in Minnesota, and that there is no merit to the plaintiff's third theory of jurisdiction.[7]

IV. *The Theory that the Assertion of Patent Claims Constitutes the Use of Personal Property within the State—*

■ In its final jurisdictional theory, the plaintiff contends that the letters threatening infringement action subject the defendants to the jurisdiction of Minnesota courts, because a patent is personal property under 35 U.S.C. § 261, and M.S.A. § 543.19 Subd. 1(a) reaches any nonresident who "owns, uses, or possesses any real or personal property situated in this state." The plaintiff cites *B & J Manufacturing Co. v. Solar Industries, Inc., supra; Imperial Products, Inc. v. Zuro*, No. 4–70–Civ. 471 (D. Minn. July 1, 1971); and *Graham v. Sewerage Commission*, No. 4–70–Civ. 413 (D.Minn. June 7, 1971) (dictum), in support of this theory.

The Court recognizes that the cited cases support the contention that letters sent to a State resident threatening patent infringement action may constitute the "use of personal property" contemplated by the Minnesota long-arm

statute. The Court further acknowledges that dictum in the *Zuro* case indicated that the sending of a single letter might be sufficient to meet the *statutory* requirements of long-arm jurisdiction. For this reason, the Court will assume for purposes of deciding the motions in the case *sub judice* that the requirements of the Minnesota long-arm statute have been met. This also requires the acceptance of the dubious proposition that the patents are "situated in" Minnesota, and the Court assumes so arguendo.

Nevertheless, the Court concludes that the due process clause precludes the assertion of *in personam* jurisdiction under the facts presented. First, the Court believes that the conditions of the Minnesota statute are not met unless the party sending the threatening letter is the actual holder of the patent. To hold otherwise would be to stretch the fiction of "use" of personal property beyond the breaking point. Thus, neither the June 1971 letter nor the October 1972 letter can trigger jurisdiction and the single triggering event under M.S.A. § 543.19 Subd. 1(a) is the March 1973 letter. This letter was admittedly requested by the plaintiff and was supplied in response to that request. To hold that the sending of the March 1973 letter triggered jurisdiction in the Minnesota courts would be to sanction a jurisdictional trap. The Court is of the view that this would offend "traditional notions of fair play and substantial justice."

Moreover, in both *B & J Manufacturing* and *Zuro*, the defendant had other meaningful contacts with the State. In *B & J Manufacturing*, the defendant sold products other than the patented item to distributors in Minnesota, and occasionally sent "sales service personnel" into the State to monitor the quali-

---

7. The plaintiff has implicitly conceded the weakness of this theory of jurisdiction in another portion of its brief, where it suggests that fairness requires retention of jurisdiction because there may be no other forum in the United States where jurisdiction can be as-

serted. This suggestion recognizes that New York would probably not be able to assert personal jurisdiction over Nortene or Netlon, notwithstanding the fact that a settlement meeting was conducted there immediately following the St. Paul meeting.

ty control of those products. The Eighth Circuit was able to conclude that:

" . . . the requests and threats were designed to reduce competition and thereby improve defendant's marketing and economic position. As such, we are convinced that the sending of these letters did, in a very real sense, constitute a transaction of business in Minnesota. . . . " *B & J Manufacturing Co. v. Solar Industries, Inc., supra,* at 598.

By contrast, in the present case, this Court is not able to say that Nortene's purpose was to improve its marketing and economic position in Minnesota—a place in which it maintained no business offices and to which it did not sell any products. Rather, the purpose behind the letters appears to have been the legitimate one of preventing the plaintiff from exploiting the patents without the payment of royalties to the true owner. This Court's decision in *Imperial Products, Inc. v. Zuro, supra,* is distinguishable for the same reason. There the Court recognized that the assertion of *in personam* jurisdiction on the basis of a single threatening letter might violate the requirements of due process.

*Id.* at 4–5. But the Court found additional contacts within the State, including $23,000 worth of mail orders shipped to Minnesota residents, the solicitation and use of retail outlets within the State, and specific advertisements placed with television stations located within the State. The Court was able to conclude that the defendant's purpose in sending the threatening letters was to destroy competition with products which it was already selling in Minnesota.

The Court finds that the due process clause prohibits the use of the March 1973 letter as a jurisdictional base for two reasons: (1) the letter was requested by the plaintiff; and (2) the defendants have no other meaningful contacts with the State of Minnesota. To put it in the phraseology of *Aftanese v. Economy Baler Co.,* 343 F.2d 187 (8th Cir. 1965), the quantity of the contacts is slight and the quality of the contacts is insignificant. The fact that the cause of action is closely connected to the contacts cannot overcome the fact that the contacts are de minimis. Accordingly, the plaintiff's fourth theory will not support jurisdiction over Nortene or Netlon.[8]

8. One further comment on the use of threatening letters as a jurisdictional base is in order. It is not the rule, nor has it ever been the rule so far as this Court is aware, that a plaintiff cannot demand recourse from a wrongdoer without submitting to the jurisdiction of the wrongdoer's forum. Such a rule would leave the victim only three options: he could forego his rights entirely; he could attempt to settle the dispute without litigation, but at the price of submitting to the jurisdiction of a distant forum; or he could sue without any warning—the blitzkrieg nature of the attack being necessary to avoid vulnerability to foreign jurisdiction. A rule foreclosing options in this manner would be improper for two reasons. First, it would positively discourage the settlement of disputes, in direct conflict with other rules of law. As noted earlier in this opinion, settlement conferences are protected and encouraged. Since such conferences cannot take place unless some kind of demand has been made by the potential plaintiff, the initial demand must also be protected and even encouraged.

Second, such a rule would unjustifiably treat the victim as the wrongdoer. It is undoubtedly true that some threats of infringement action are made in bad faith for the purpose of engaging in unfair competition. But to base a generally applicable jurisdictional rule on this occasional practice would be extreme. Moreover, the patent laws anticipate that written notice of infringement will be routinely sent prior to litigation, *see* Appendix Form 16 to Federal Rules of Civil Procedure, and expressly provide that the amount of damages recoverable will often hinge on the sending of such notice. *See* 35 U.S.C. § 287 (unless patented products are clearly marked, infringer will be liable only for damages accruing after the date of notice by the patentee). *See also William Bros. Boiler & Mfg. Company v. Gibson-Stewart Co.,* 312 F.2d 385, 386 (6th Cir. 1963). It would offend "traditional notions of substantial justice and fair play" to hold that the written notice of infringement necessary to commence the running of damages submits the patentee to the foreign jurisdiction of the infringer.

■ The plaintiff has argued that the result ordered here will be harsh and unfair because the plaintiff has no other means whereby it can resolve its daily dilemma concerning the continued use of the patented processes. A closely related argument is that the underlying issue is one of American patent law, which must eventually be decided in a United States forum in any event. There are two answers to these arguments. First, a court which lacks personal jurisdiction over named defendants cannot adjudicate their rights simply because such an adjudication is needed by the plaintiff and the court is in the most convenient location. As the Supreme Court declared in *Hanson v. Denckla, supra,* 357 U.S. at 254, 78 S.Ct. at 1240:

". . . [The State] does not acquire [personal] jurisdiction by being the 'center of gravity' of the controversy, or the most convenient location for litigation. The issue is personal jurisdiction, not choice of law. . . ."

Second, and more fundamentally, the Court cannot perceive that it would be any less unfair to the defendants to require them to defend this action in Minnesota than it would be unfair to the plaintiff to dismiss the defendants. Nortene has been found by the French courts to have been, in effect, the victim of a theft. That there are any Minnesota contacts at all is due solely to the fortuity that another victim which purchased the pilfered patents (plaintiff), has its business in Minnesota. We have therefore, the classic confrontation between two victims of the same wrongdoer. American law may, as the plaintiff suggests, protect the bona fide purchaser for policy reasons which have been developed in the common law. But those policy reasons do not require that the initial victim must also be forced to submit to jurisdiction in the forum of the second (bona fide purchaser) victim. In the present litigation the only additional contacts with Minnesota are the attempts on the part of the first victim to gain settlement with the second victim on the reasonable—if disputed—belief that the bona fide purchaser rule does not control the matter.

■ It is true that the bona fide purchaser question is ultimately one of American law and that, at the moment, Minnesota appears to be the only reasonable forum in which that issue may ultimately be determined. Indeed, if the defendants wish to assert their rights under the patents, it appears inevitable that suit will have to be commenced in this judicial district, and their unwillingness to litigate the merits in this case is perhaps strange. Nevertheless, the plaintiff seeks to invoke the special benefits of the declaratory judgment technique, and it is the peculiarities of that technique which give rise to the problems of jurisdiction. The plaintiff's claim of unfairness must be assessed in light of the fact that the power to issue declaratory judgments did not exist in the Federal courts until the Federal Declaratory Judgment Act was enacted in 1934. 48 Stat. 955. *See Willing v. Chicago Auditorium Ass'n,* 277 U.S. 274, 289, 48 S.Ct. 507, 72 L.Ed. 880 (1928).

The plaintiff retains its action against Alimentaire. If Nortene or Netlon bring future threats of infringement action, a new declaratory judgment action may be commenced against them and the Court will reconsider the jurisdictional issue in light of the new developments. If the infringement suit is actually brought, the plaintiff can defend on the basis of the bona fide purchaser rule at that time, and may also have available to it the defense of laches. *See, Briggs v. Wix Corp.,* 308 F.Supp. 162, 169 (N.D.Ill.1969).

It is ordered:

That the motions of defendants Nortene and Netlon for dismissal of the complaint against them for lack of personal jurisdiction be, and are hereby, granted.