———————

No. 95-2853

———————

Digi-Tel Holdings, Inc.,           *
                                   *
          Appellant,               *
                                   *   Appeal from the United States
     v.                            *   District Court for the District
                                   *   of Minnesota.
Proteq Telecommunications          *
(PTE), Ltd.,                       *
                                   *
          Appellee.                *
-----------------------------
Brustuen International, Inc.,       *
                                   *
          Intervenor.              *

———————

            Submitted:  March 13, 1996

              Filed:  July 11, 1996
———————

Before FAGG, BRIGHT, and WOLLMAN, Circuit Judges.

———————

BRIGHT, Circuit Judge.


     Digi-Tel Holdings, Inc. (Digi-Tel) appeals the order of the district court[1] dismissing its breach of contract and fraud claims against Proteq Telecommunications (PTE), Ltd. (Proteq) for lack of personal jurisdiction. The district court held that the exercise of personal jurisdiction over Proteq, a Singapore company, was not consistent with due process because Proteq did not have sufficient "minimum contacts" with the State of Minnesota.  We affirm.

—————————————

     [1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

## I. BACKGROUND

Proteq, a Singapore company, is a wholly-owned subsidiary of Proteq Technologies PTE, Ltd., a Singapore company, which in turn is a wholly-owned subsidiary of Goldtron, Ltd., also a Singapore company. Since its incorporation on July 16, 1992, Proteq's business has been the research and development of telecommunication products. Proteq does not maintain any offices, have any employees, or own any property in Minnesota. There is no evidence that Proteq has ever solicited business or advertised in Minnesota. Proteq is not licensed to do business in Minnesota and has no personnel or agents authorized to accept process within Minnesota.

Major Computer Incorporated (Major), a Minnesota corporation, enlisted the assistance of Brustuen International, Inc., a Minnesota-based international trade consulting firm, in an effort to locate a manufacturing source of cellular telephones. As a result of these efforts, in the summer of 1992, Major entered into an agreement to purchase up to 240,000 cellular phones from Proteq. There were seven face-to-face meetings between Proteq and Major regarding developing and selling the cellular phones, all of which took place in Singapore. On one of these occasions, Major's Vice President obtained a sample cellular phone, and Proteq sent four additional samples to Major in Minnesota. The parties exchanged dozens of letters and faxes and numerous phone calls in connection with the sales agreement.

The Proteq/Major agreement provided that the agreement would be construed and governed by Minnesota law. Under the terms of the contract, Major would assume control of the phones while they were still in Singapore. The sales agreement provided the price as "F.O.B. Singapore." Delivery of the phones was expected to begin sometime late in 1992. The duration of the contract was the later of two years or 240,000 units. In addition, Major had the option to renew under certain conditions.

Proteq encouraged Major to re-sell the phones to Major's customers before they were manufactured.  Less than one month after signing its agreement with Proteq, Major contracted to sell these same cellular phones to Digi-Tel.

In December of 1992, Goldtron (the parent company of Proteq) applied to the Minnesota Secretary of State for registration of the trademark "Goldtron."  Goldtron obtained a "Certificate of Registration of Mark."[2]  The application extended to a range of products including cellular phones and audio and security equipment.  Proteq mailed a copy of the trademark certificate to Major shortly after the certificate was obtained.  The sample phone which Proteq had sent to Major in July of 1992 bore the mark "Goldtron", and Proteq admits that it considered using "Goldtron" as the trademark on the phone.

Proteq never delivered cellular phones to Major, and Major was unable to fulfill its agreement with Digi-Tel.  Digi-Tel filed suit against Major for breach of the Major/Digi-Tel agreement.  Major subsequently experienced financial difficulties which resulted in Major's secured creditor foreclosing on its assets.

In December of 1993, an employee of Goldtron and an employee of a Hong Kong subsidiary of Goldtron traveled to Minnesota to meet with representatives of Digi-Tel.  At the meeting they discussed the possibility of enlisting Digi-Tel to help in obtaining FCC approval of a cellular phone and for marketing and distributing the phone.  The phone was a different model than that envisioned under the Proteq/Major agreement.  They delivered samples of the phone to

---

[2]Under Minnesota law, a Certificate "shall be admissible in evidence as competent and sufficient proof of the registration of such mark, in any action or judicial proceedings in any court of [Minnesota] and shall be prima facie evidence of registrant's ownership and exclusive right to use the mark on or in connection with the goods or services described in the certificate."  Minn. Stat. § 333.21.

the Digi-Tel representatives.  They also offered Digi-Tel $100,000 to resolve Digi-Tel's claims against Proteq.[3]  Digi-Tel declined the offer.

Digi-Tel subsequently filed suit against Proteq for fraud and breach of contract.  Digi-Tel acquired Major's interest in the Proteq/Major agreement from Major's secured creditor.  Digi-Tel commenced the action against Proteq as a third-party beneficiary of the Major/Proteq agreement and as the assignee of Major's rights under that agreement.  Digi-Tel served Proteq under Minnesota long-arm statute § 303.13.  Following a hearing on June 30, 1995, at which no live testimony was presented, the district court granted Proteq's motion to dismiss for lack of personal jurisdiction.  The district court determined that the exercise of personal jurisdiction over Proteq would violate due process because Proteq lacked sufficient minimum contacts with the State of Minnesota.  Digi-Tel appealed.

## II. DISCUSSION

To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant.  Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995); Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994); Watlow Elec. Mfg. Co. v. Patch Rubber Co., 838 F.2d 999, 1000 (8th Cir. 1988).  For the purposes of a prima facie showing, the court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor.  Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991).  We

---

[3]Although Proteq denies that such an offer was made, for the purposes of establishing a prima facie showing of jurisdiction, we assume the existence of such an offer.

review de novo whether the plaintiff has presented a prima facie case of personal jurisdiction. Bell Paper Box, Inc. v. Trans Western Polymers, Inc., 53 F.3d 920, 921 (8th Cir. 1995); Northrup King, 51 F.3d at 1387.

In deciding whether a court has personal jurisdiction over a non-resident defendant, this court is guided by two primary rules. First, the facts presented must satisfy the requirements of the forum state's long-arm statute. Second, the exercise of personal jurisdiction over the defendant must not violate due process. Northrup King, 51 F.3d at 1387. Because the district court concluded that due process would be violated if personal jurisdiction were conferred over Proteq, it did not reach the issue of whether or not the requirements of the Minnesota long-arm statute were met.

Due process mandates that jurisdiction be exercised only if defendant has sufficient "minimum contacts" with the forum state, such that summoning the defendant to the forum state would not offend "`traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). To maintain personal jurisdiction, defendant's contacts with the forum state must be more than "random," "fortuitous," or "attenuated." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). Sufficient contacts exist when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). In assessing the defendant's reasonable anticipation, there must be "`some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Burger King, 471 U.S. at 475 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). Jurisdiction is proper where the contacts proximately result from

actions by the defendant itself that create a "substantial connection" with the forum State.  Id.

In conjunction with these basic principles of due process, this court applies a five-factor test in analyzing the constitutional requirements needed for personal jurisdiction:  (1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action to these contacts[4]; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.  Wessels, Arnold & Henderson v. Nat'l Medical Waste, Inc., 65 F.3d 1427, 1432 (8th Cir. 1995); Trans Western Polymers, 53 F.3d at 922; Aaron Ferer & Sons Co. v. Diversified Metals Corp., 564 F.2d 1211, 1215 (8th Cir. 1977).  The first three factors are of primary importance, and the last two are "secondary factors."  Minnesota Min. and Mfg. Co. v. Nippon Carbide Indus. Co., 63 F.3d 694, 697 (8th Cir. 1995), cert. denied, 116 S.Ct. 1288 (1996); Northrup King, 51 F.3d at 1388. Because the first three factors are closely interrelated, we consider them together.

Digi-Tel has established the existence of certain contacts between Proteq and the forum.  First, Proteq sent numerous letters and faxes and made several telephone calls to Minnesota in

---

[4]This third factor distinguishes whether the jurisdiction is specific or general.  Wessels, Arnold & Henderson v. National Medical Waste, Inc., 65 F.3d 1427, 1432 n.4 (8th Cir. 1995); Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 819 (8th Cir. 1994).  Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant regardless of where the cause of action arose. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8 & 9 (1984).  The alleged contacts in the present action are related to the dispute that resulted in this suit, and therefore we have an assertion of specific rather than general jurisdiction.

-6-

connection with the Proteq/Major contract. Second, the contract contains a Minnesota choice-of-law provision. Although letters and faxes may be used to support the exercise of personal jurisdiction, they do not themselves establish jurisdiction. Wessels, Arnold & Henderson, 65 F.3d at 1433; Northrup King, 51 F.3d at 1388; Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 656 (8th Cir. 1982). Similarly, although a choice-of-law provision may be considered for jurisdictional purposes as it may "reinforc[e] (defendant's) deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there[,]" Burger King, 471 U.S. at 482, it is insufficient in itself to confer jurisdiction. Id.; Wessels, Arnold & Henderson, 65 F.3d at 1434. We agree with the district court that, in the circumstances of this case, these contacts do not create a "substantial connection" to Minnesota sufficient to subject Proteq to personal jurisdiction in the state.[5]

Digi-Tel cites Proteq's shipment of four sample cellular phones to Major in Minnesota as another contact with the forum

---

[5]Digi-Tel also argues that the agreement was "effectively executed" in Minnesota. The contract provides:

> Acceptance of this Agreement shall be constituted by receipt of this document by MAJOR, it being effectively executed by the legal representatives of PROTEQ at the office of Major . . . before 10:00 am, CST, the 13th August 1992 or by receipt of this document by its signors, it being fully executed. It shall become effective at the time and date of acceptance.

(A-57). Digi-Tel argues that Proteq thus specifically agreed that the contract would be deemed executed by Proteq's representatives in Minnesota. Proteq asserts that the provision allows two alternative modes of acceptance. Proteq argues that the second mode of acceptance, "by receipt of this document by its signors, it being fully executed," was the method employed in this case. We merely observe that, "[t]he [United States Supreme] Court long ago rejected the notion that personal jurisdiction might turn on `mechanical' tests or on `conceptualistic . . . theories of the place of contracting or of performance.'" Burger King, 471 U.S. at 478 (citations omitted).

state.   While this shipment of samples has relevance, its effect is minimal.   We observe that on another occasion, Major's Vice President picked up a sample phone while in Singapore.   The shipment of the samples into the forum represents a "casual" or "fortuitous" contact rather than a significant contact with the forum.   See International Shoe, 326 U.S. at 320; Burger King, 471 U.S. at 475.

Digi-Tel also argues that the district court erred by refusing to impute Goldtron's contacts with Minnesota to Proteq.[6]   In determining whether "minimum contacts" exist, contacts with the forum state that are made **on behalf of** the defendant by others may be considered.   The Supreme Court has indicated that "when commercial activities are `carried on in behalf of' an out-of-state party those activities may sometimes be ascribed to the party, at least where [it] is a `primary participan[t]' in the enterprise and has acted purposefully in directing those activities."   Burger King, 471 U.S. at 479 n.22 (citations omitted).   In U.S. Kids, Inc., 22 F.3d 816, this court considered a visit by an independent

---

[6]Proteq asserts that Digi-Tel did not raise this attribution theory in the district court and should not be allowed to present it on appeal.  Proteq asserts that Digi-Tel raised a "piercing the corporate veil" argument in the district court and presented its theory that contacts initiated "on behalf of" Proteq should be attributable to it for the first time on appeal.  Upon review of the record, however, we conclude that Digi-Tel did make a general claim that Goldtron's two contacts with Minnesota should be attributed to Proteq.  Digi-Tel has submitted no new facts on appeal.  Under these circumstances we will consider Digi-Tel's attribution argument.  See Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996) (rule that appellate courts do not consider arguments raised for first time on appeal is "`not a flat rule but rather a matter of prudence and discretion'") (quoting Struempler v. Bowen, 822 F.2d 40, 42 (8th Cir. 1987)); Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1314 (8th Cir. 1991) ("'We think it would be in disharmony with one of the primary purposes of appellate review were we to refuse to consider each nuance or shift in approach urged by a party simply because it was not similarly urged below.'")(quoting In re Osweiler, 346 F.2d 617, 621 (C.C.P.A. 1965)).

businessman on behalf of the defendant to plaintiff's place of business as a contact between defendant and the forum. The court noted that the businessman lacked any independent relationship with the plaintiff and had no reason to visit plaintiff's business other than as defendant's agent. Id. at 819 n.1.

In December of 1992, Goldtron (Proteq's parent company) applied for a Minnesota copyright, and in December of 1993 two Goldtron representatives visited Digi-Tel in Minnesota. Although Digi-Tel argues that these contacts should be imputed to Proteq, it fails to produce evidence sufficient to support the inference that Goldtron's activities were directed by or primarily for the benefit of Proteq. First, there is insufficient factual support in the record to create an inference that the December 1992 Minnesota trademark application was filed at the direction of or primarily for the benefit of Proteq. In May of 1992, "Goldtron" was the new name of the Singapore corporation, Gold Coin Limited. Later that year, Goldtron began a worldwide effort to register its new trademark. Furthermore, the Minnesota trademark covered a range of products including not only cellular phones, but also mobile fax machines, digital compact cassette players and security equipment.[7]

In December of 1993, two representatives of Goldtron travelled to Minneapolis, Minnesota to meet with representatives of Digi-Tel. One of Goldtron's representatives later drafted an internal memorandum which listed three purposes for the visit:

---

[7]Digi-Tel points to the fact that Proteq sent Major a copy of the trademark application as evidence of the fact that Goldtron obtained the trademark on behalf of Proteq. The fax accompanying the certificate stated simply, "Attached Certificate of Registration of Mark for `GOLDTRON' in USA for your info and file." (A-43-44). There is no indication that the registration was obtained for the Proteq/Major transaction or for the benefit of Proteq.

1) To hand carry our cellular phone for FCC Approval

2) To re-establish our relationship with DIGI-TEL as a marketing and distribution agent for the said cellular phone

3) To obtain information on DIGI-TEL's legal action against Major Computers Inc.

(A-251). Digi-Tel also claims that at the meeting, the Goldtron representatives offered Digi-Tel $100,000 to resolve Digi-Tel's legal claims. Digi-Tel rejected the offer.

Digi-Tel, however, again fails to produce evidence sufficient to support the inference that the meeting in Minnesota was not for Goldtron's own business purposes but was directed by or primarily for the benefit of Proteq. First, the sample phone provided to Digi-Tel at the Minnesota meeting had a different design than the cellular phone being developed by Proteq. The phone was developed under a joint venture between another Goldtron subsidiary and a Taiwanese business. Furthermore, after the meetings, Digi-Tel and Goldtron executed a document which specified, "Goldtron, Ltd. represents and acknowledges that it is not supplying the above described cellular telephones pursuant to its contract with Major . . . and the contract between Major and Digi-Tel." (A-2245).

Secondly, as to the discussion of a possible settlement, courts have hesitated to use unsuccessful settlement discussions as "contacts" for jurisdictional purposes. See Minnesota Min. and Mfg. Co., 63 F.3d at 698; Conwed Corp. v. Nortene, S.A., 404 F. Supp. 497, 504-505 (D. Minn. 1975). Giving jurisdictional significance to such activities may work against public policy by hindering the settlement of claims. Regardless, even including any negotiations concerning the contractual dispute between Digi-Tel and Major, which indirectly involved Proteq, Digi-Tel has failed to provide evidence to support the inference that the meeting was conducted primarily for the benefit or at the direction of Proteq.

The series of events culminating in this suit began with Major seeking out a manufacturing source for cellular phones. All seven of the face-to-face meetings regarding Proteq's sale of cellular phones to Major took place in Singapore. No part of the contract was to be performed in Minnesota. See Wessels, Arnold & Henderson, 65 F.3d at 1433. Proteq was to develop and produce the phones overseas and transfer ownership to Major in Singapore. The delivery term was "F.O.B. Singapore" which means that the seller was obligated to deliver to Singapore and nowhere else. See, U.S. Kids, Inc., 22 F.3d at 819. We pause to emphasize that no shipment of actual product came into Minnesota. The only domestic element of the agreement related to the interpretation of the contract under Minnesota law.

Thus the negotiations, meetings, production, and delivery were all centered in Singapore. The contacts with Minnesota appear at best as inconsequential rather than substantial under these circumstances. Proteq did not create a substantial connection between itself and Minnesota, it merely engaged in negotiations with a purchaser who happened to reside in Minnesota. Given the nature and quality of Proteq's contacts with Minnesota, traditional notions of fair play and substantial justice indicate that the corporation in Singapore would not expect to litigate in the State of Minnesota.

Our consideration of the "secondary factors" does not change this conclusion. First, we note that Minnesota has an obvious interest in providing a local forum in which its residents may litigate claims against non-residents. However, Minnesota's interest in providing its residents with a forum cannot make up for the absence of minimum contacts. See Falkirk Min. Co. v. Japan Steel Works, Ltd., 906 F.2d 369, 376 (8th Cir. 1990). The convenience of the parties favors neither side. Witnesses are in both Minnesota and Singapore. Finally, as the United States Supreme Court stated in Asahi Metal Indus. Co. v. Superior Court of

-11-

<u>California</u>, 480 U.S. 102, 115 (1987), "`Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" (quoting <u>United States v. First Nat'l City Bank</u>, 379 U.S. 378, 404 (1965) (Harlan, J. dissenting)).  <u>See also</u> <u>Falkirk Min. Co.</u>, 906 F.2d at 376 ("The careful inquiry we are required to make before exercising jurisdiction over foreign defendants supports our conclusion that no personal jurisdiction exists here, especially given the absence of minimum contacts between appellees and the [forum].").

**III. CONCLUSION**

Accordingly, we affirm the order of the district court dismissing the complaint for lack of personal jurisdiction.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.