**GUINNESS IMPORT COMPANY,**
Plaintiff,

v.

**MARK VII DISTRIBUTORS, INC.,**
Defendant and Third–Party
Defendant,

v.

**DESNOES & GEDDES, LTD.,**
Third–Party Defendant.

Civil No. 4–96–20 (DSD/JMM).

United States District Court,
D. Minnesota,
Fourth Division.

July 16, 1997.

James J. Bertrand, Nicole Engisch, Richard J. Wegener and Leonard, Street & Deinard, Minneapolis, MN, for Guiness Import Co.

Michael D. Madigan, Thomas P. Harlan and Johnson & Madigan, Minneapolis, MN, for Mark VII Distributors, Inc.

Nicole A. Engisch, Richard J. Wegener, Leonard Street & Deinard, Minneapolis, MN, for Desnoes & Geddes Ltd.

## ORDER

DOTY, District Judge.

This matter is before the court on third-party defendant's motion to dismiss, defendant's motion for abstention, plaintiff's motion for summary judgment, and defendant's motion for partial summary judgment. Based on a review of the file, record and proceedings herein, the court denies Mark VII's motions to abstain and for partial summary judgment, grants Desnoes and Geddes' motion to dismiss, and grants Guinness' motion for summary judgment.

## BACKGROUND

Plaintiff Guinness Import Company ("Guinness") is an importer of malt beverage

and cider products. Defendant and third–party plaintiff Mark VII Distributors, Inc. ("Mark VII") is a Minnesota beer wholesaler engaged in the business of selling and distributing malt beverages and other beverage products at wholesale. Third–party defendant Desnoes and Geddes, Ltd. ("D&G") is a Jamaican brewer of beer products, including Red Stripe Lager ("Red Stripe") and Dragon Stout.

In 1991, D&G entered into an importation agreement with Labatt Importers, Inc. ("Labatt") in which Labatt was appointed as D&G's exclusive United States importer of Red Stripe and Dragon Stout. Labatt entered into a distribution agreement with Mark VII for the distribution of the products in Minnesota. In 1995, Labatt's parent company was purchased by Interbrew, a Belgium brewer. Under D&G's and Labatt's agreement, either party could terminate their relationship "in the event the other party has a change in ownership pursuant to which 51 percent or more of the party becomes beneficially owned or controlled by a person or entity other than current shareholders as of the date of this Agreement." Importation Agreement, Engisch Aff., Ex. A. Pursuant to the importation agreement, D&G terminated Labatt as its exclusive importer, so Labatt was entitled to payment of $600,000 as required by the terms of the agreement. By later dated September 8, 1995, Labatt informed Mark VII that Labatt was acquired by Interbrew and with the change in ownership, D&G "elected to terminate its supplier agreement with" Labatt and "appointed effective December 1, 1995, Guinness Import Company as its new United States importer." Letter by Thane Pressman, President and CEO of Labatt, Engisch Aff., Ex. E. In December 1995, D&G appointed Guinness as its importer of Red Stripe and Dragon Stout, for which Guinness paid D&G $600,000. By letter dated December 11, 1995, Guinness informed Mark VII of its appointment as the importer and sole source of supply of the Red Stripe and Dragon Stout brands. Guinness also stated that:

Accordingly, [Guinness] has appointed its network of distributors for Minnesota and Mark VII Distributors ("Mark VII") was not among the distributors [Guinness] appointed. Please be advised that [Guinness] has appointed a network of its existing distributors to distribute the above-mentioned brands in the general marketing area within which Mark VII operates.

Letter by Jack Raineault, Engisch Aff., Ex. F. By letter dated December 15, 1995, counsel for defendant challenged Guinness' conduct as violating the Minnesota Beer Brewers and Wholesalers Act, Minnesota Statutes, Chapter 325B ("the Act").

In January 1996, Guinness commenced this action seeking a declaratory judgment that it is not liable to Mark VII under the Act for allegedly improperly terminating Mark VII as the distributor of Red Stripe and Dragon Stout. Specifically, Guinness seeks a declaratory judgment that it has no obligation to sell Red Stripe and Dragon Stout or any other product to Mark VII and that it has not acted to violate Minnesota Statutes, Chapter 325B. Mark VII alleged counterclaims against Guinness, seeking declaratory judgment and relief for violations of the Act, tortious interference with contract and prospective economic advantage, promissory or equitable estoppel, and unjust enrichment. Mark VII also filed a third-party complaint alleging the same counts against D&G.

Mark VII moves the court to abstain from considering this matter under the abstention doctrine promulgated in *Burford v. Sun Oil Company*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). D&G moves the court to dismiss the third–party complaint for insufficiency of service of process or, in the alternative, for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Guinness moves the court for summary judgment on all claims and counterclaims; and Mark VII moves the court for partial summary judgment.

## DISCUSSION

### A. Motion to Abstain

The court first addresses whether Burford abstention is appropriate in this case. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In general, abstention is " 'an extraordinary and

narrow exception to the duty of a District Court to adjudicate a controversy properly before it.' " *Arkansas Medical Society Inc. v. Reynolds,* 6 F.3d 519, 529 (8th Cir.1993) (quoting *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 96 S. Ct. 1236, 1244, 47 L.Ed.2d 483 (1976)); *Wolfson v. Mutual Benefit Life Ins. Co.,* 51 F.3d 141, 144 (8th Cir.1995) (referring to extraordinary circumstances as appropriate for Burford abstention). It is well established that abstention is the exception, rather than the rule. *Melahn v. Pennock Ins., Inc.,* 965 F.2d 1497, 1503 (8th Cir.1992).

■ The Burford doctrine states that "where timely and adequate state–court review is available, a federal court sitting in equity must decline to interfere": (1) when there are " 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar' "; or (2) where the " 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *New Orleans Public Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244–45); *Bilden v. United Equitable Ins. Co.,* 921 F.2d 822, 825 (8th Cir.1990) ("Burford abstention applies when a state has established a complex regulatory scheme supervised by state courts and serving important state interests, and when resolution of the case demands specialized knowledge and application of complicated state laws.").

Although Burford abstention is concerned with protecting complex state regulatory schemes from interference by federal courts, there is no such danger in this case. Admittedly, this case requires an interpretation of the Minnesota Beer Brewers and Wholesalers Act, Minnesota Statutes, Chapter 325B, but this statute does not require a specialized knowledge or involve a complex regulatory scheme. In the exercise of diversity jurisdiction, federal courts are routinely called upon to interpret state law. Burford abstention is not warranted under the circumstances of this case.

**B. Motion to Dismiss** [1]

D&G moves for dismissal of Mark VII's claims for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Mark VII carries the burden of making a prima facie showing that the court has personal jurisdiction over the non-resident defendant. *Digi–Tel Holdings, Inc. v. Proteq Telecommunications, Ltd.,* 89 F.3d 519, 522 (8th Cir.1996). When considering a Rule 12(b)(2) motion, the court must view the evidence in favor of the complaining party and resolve all factual conflicts in that party's favor. *Id.; Watlow Elec. Mfg. Co.v. Patch Rubber Co.,* 838 F.2d 999, 1000 (8th Cir. 1988).

■ A federal court may assume jurisdiction over nonresident defendants only to the extent permitted by the long–arm statute of the forum state and by constitutional due process. *Wessels, Arnold & Henderson v. National Medical Waste, Inc.,* 65 F.3d 1427, 1431 (8th Cir.1995). Minnesota state courts have held that the Minnesota Legislature intended the state's long-arm statute to have

1. D&G asserts that Mark VII has failed to satisfy the requirements of Rule 4 of the Federal Rules of Civil Procedure for effective service of process. Service of process is a jurisdictional prerequisite to maintaining an action in federal court:

"Before a federal court may exercise personal jurisdiction over a [party], the procedural requirement of service of summons must be satisfied. '[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served.' " *Wilson v. St. Mary's Hosp.,* 822 F.Supp. 1450, 1452 (D.Minn.1993) (quoting *Omni Capital Int'l,*

*v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987)). " '[A]ctual knowledge of the existence of a lawsuit is insufficient to confer personal jurisdiction over a defendant in the absence of valid service of process.' " *Wilson,* 822 F.Supp. at 1452 (quoting *Mid–Continent Wood Prods., Inc.v. Harris,* 936 F.2d 297, 301 (7th Cir.1991)). Because this court concludes that D&G does not have sufficient minimum contacts to satisfy constitutional due process requirements for personal jurisdiction, the court need not address the merits of D&G's argument as to service of process.

the maximum extraterritorial effect allowed under the Constitution; thus, the court must consider whether the assertion of jurisdiction over D&G is consistent with due process. *Minnesota Mining & Manufacturing v. Nippon Carbide Industries*, 63 F.3d 694, 697 (8th Cir.1995) (citing *Domtar, Inc., v. Niagara Fire Insurance Co.*, 518 N.W.2d 58, 60–61 (Minn.App.1994), *aff'd*, 533 N.W.2d 25 (Minn.), *cert. denied*, —— U.S. ——, 116 S.Ct. 583, 133 L.Ed.2d 504 (1995)), *cert. denied*, —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996).

Due process is satisfied when non–resident defendants have "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The requisite minimum contacts must be based on acts of the defendant. *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Whether the minimum contacts are sufficient to satisfy due process depends upon whether the defendant has "'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)). "Purposeful availment" means deliberately engaging in significant activities within a state or creating "continuing obligations" between the litigant and residents of the forum. *Burger King*, 471 U.S. at 475–76, 105 S.Ct. at 2183–84. A defendant must have "fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J. concurring). Minimum contacts need not include physical presence, but the contacts must be more than "random," "fortuitous," or "attenuated." *Bell Paper Box, Inc. v. Trans Western Polymers*, 53 F.3d 920, 922 (8th Cir.1995) (citing *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183–84).

In other words, minimum contacts with the forum state are sufficient if the nonresident defendant "'should reasonably anticipate being haled into court there.'" *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir.1995) (citing *World World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980))

■ The court, in determining the sufficiency of defendant's contacts, considers several factors: (1) the quantity of contacts with the forum state; (2) the nature and quality of contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience or inconvenience to the parties. *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir.1994); *Sybaritic, Inc. v. Interport Intern., Inc.*, 957 F.2d 522, 524 (8th Cir.1992) (explaining that the analytical framework incorporates the notions of both "minimum contacts" and "fair play and substantial justice"). The first three considerations are "primary factors," whereas the latter two considerations are "secondary factors" in the inquiry. *Northrup King*, 51 F.3d at 1388. The third factor has been further discussed by the courts as distinguishing between specific and general jurisdiction. "'Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state while general jurisdiction refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.'" *Burlington Industries, Inc. v. Maples Industries, Inc.*, 97 F.3d 1100, 1102 (8th Cir.1996) (quoting *Bell Paper Box*, 22 F.3d at 819). Because the first three factors are interrelated, the court will consider those factors together.

■ Mark VII asserts that D&G has sufficient minimum contacts with Minnesota to satisfy due process. In evaluating the nature and quality of the contacts, the court attempts to ascertain whether the defendant purposefully availed itself of the benefits and protections of Minnesota law. *Burger King*,

471 U.S. at 474, 105 S.Ct. at 2183. Mark VII argues that D&G's "continuous and systematic contacts within the state satisfies general . . . personal jurisdiction requirements, and its directed and purposeful efforts to register its agent and its products as well as establish a distribution system to sell the same satisfies . . . specific jurisdiction requirements." Mark VII argues that D&G has sold Red Stripe and Dragon Stout in Minnesota, established a state-wide distribution network, registered the Red Stripe and Dragon Stout labels with the Minnesota Liquor Control Division, and took other steps to ensure its ability to sell its products in Minnesota.

The court recognizes that Mark VII does not allege that D&G is licensed to do business within Minnesota; maintains a bank account, phone number or mailing address in Minnesota; owns or possesses property in Minnesota; or maintains any employees or agents for service of process in Minnesota. Rather, Mark VII argues that D&G filed documentation with the Department of Public Safety, Division of Liquor Control, that Labatt, and later Guinness, were D&G's exclusive importers and authorized to do all things necessary to sell products in the state. However, there is no evidence that D&G actually filed the documentation. Rather, in order for the importer to import Red Stripe or Dragon Stout into Minnesota, the Minnesota Liquor Act, Minnesota Statutes, Chapter 340A, requires that the brand labels be registered with and approved by the commissioner. *See* Minn.Stat. § 340A.311. The label of any brand may be registered only by the brand owner or authorized agent. *Id.* Moreover, no such brand may be imported into the state for sale without the consent of the brand owner or authorized agent. *Id.* As the authorized importers, Labatt and Guinness registered the Red Stripe and Dragon Stout brands so that they could import such brands into the state. Under the importation agreements, D&G is the exclusive owner of the "Red Stripe" and "Dragon Stout" trademarks and label, package and logo designs used in association with the products, however the importers had the exclusive right to use such trademarks. The importers submitted letters to the Liquor Control Division from D&G addressed "to whom it may con-

cern" which stated that the importers were respectively the exclusive and primary source of American supply for the Red Stripe and Dragon Stout products and that the importers were respectively authorized to take whatever steps deemed necessary or required by law to effect the lawful sale of the products within the United States. *See* Madigan Aff., dated December 6, 1996, Ex. D; Madigan Aff., dated October 21, 1996, Exs. C and D. Thus, for the purposes of the brand registration, the importers were authorized agents within the meaning of the statute. However, the fact that D&G's brands were registered in Minnesota with the authority of D&G is not a continuous and systematic contact of a nature and quality to constitute a purposeful avail of the benefits and protections of Minnesota law.

Mark VII also asserts that D&G established a distribution system to distribute its products in Minnesota. Mark VII's contentions would require the court to attribute to D&G the contacts of the importers and distributors as agents acting on behalf of D&G in the distributorship network. *See Industrial Indemnity Co. v. Harms*, 28 F.3d 761, 762 (8th Cir.1994) (recognizing that to establish an agency relationship one must prove the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act); *Curry v. McIntosh*, 389 N.W.2d 224, 228 (Minn.Ct.App.1986) (recognizing that to impute contacts to the state based on an agency relationship, the complaining party must make a showing of ability to control which is a critical element of agency); *see also Digi–Tel Holdings*, 89 F.3d at 524 (quoting from *Burger King*, 471 U.S. at 480 n. 22, 105 S.Ct. at 2186 n. 22, and recognizing that in evaluating contacts, the court may consider contacts with the forum state which were made by others on behalf of a party, at least when the party is a " 'primary participan[t]' in the enterprise and has acted purposefully in directing those activities").

Although only a prima facie showing is necessary at this stage in the litigation, Mark VII has made no showing that D&G exercised control over the distribution of the Red

Stripe or Dragon Stout products in the United States or control over the importer's decisions as to distribution. The importation agreements specifically reject the argument that D&G had or has any control over distributorship decisions. Furthermore, the distributorship agreements were made between the importer and the distributor. The court concludes that Mark VII has failed to make a prima facie showing of an agency relationship to impute the activities of the importers and the distributors when evaluating D&G's contacts with the state. Thus, Mark VII has not alleged contacts of a continuous and systematic nature for this court to exercise general personal jurisdiction over D&G.

The court also considers Mark VII's arguments in favor of specific jurisdiction. As stated, specific personal jurisdiction refers to a non–resident purposely directing its activities at forum residents, and the litigation before the court results from injuries arising out of or relating to those activities. *Burlington Industries,* 97 F.3d at 1103. Mark VII asserts that jurisdiction is properly exercised over D&G because it was reasonably foreseeable to D&G that products would be sold in Minnesota. Mark VII refers the court to the "stream of commerce" theory, which is a type of specific jurisdiction in which the non–resident places its product into the stream of commerce. *See Barone v. Rich Bros. Interstate Display Fireworks,* 25 F.3d 610, 612 (8th Cir.), *cert. denied,* 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994). The cases which discuss this theory typically involve a manufacturer who has placed a defective product into the stream of commerce in which the sales in the forum state were of significance and in which the ultimate consumer was injured allegedly due to the defect. *See e.g., Barone,* 25 F.3d at 614–15. Courts typically do not extend the stream of commerce theory beyond the products liability context or beyond a dispute pertaining to the actual product. *See e.g., Hershey Pasta Group v. Vitelli–Elvea Co., Inc.,* 921 F.Supp. 1344, 1346 (M.D.Pa.1996) (discussing stream of commerce theory when case involved mislabeling of product). The litigation before this court involves Mark VII's termination as the distributor of Red Stripe and Dragon Stout in the state, without regard to the statutory requirements of the Minnesota Beer Brewers and Wholesalers Act. In this instance, the cause of action relates to the relationship between the parties and not to the placement of a defective product into the stream of commerce. Considering the totality of the circumstances, the court concludes that D&G's contacts with the forum state are not of the nature and quality which satisfy a prima facie showing of personal jurisdiction.

Mark VII also asserts that the exercise of personal jurisdiction is consistent with fair play and Minnesota's interest in providing its citizens a forum. Although it is true that Minnesota has an interest in providing a forum for its residents, such an interest cannot confer jurisdiction upon the court without sufficient minimum contacts. Thus, Mark VII's third–party complaint against D&G is dismissed without prejudice for lack of personal jurisdiction.

## C. Motions for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material if its resolution affects the outcome of the case. There is a genuine issue of fact if the evidence is such that it could be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Judgment is granted for the moving party if, under the governing law, there can be but one reasonable conclusion as to a jury's verdict. *Id.*

On a motion for summary judgment, all evidence and inferences are viewed in a light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Nevertheless, the nonmoving party may not rest upon mere denials or allega-

tions in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a complaining party cannot support each essential element of its claim, summary judgment must be granted for the answering party because a failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court addresses the motions for summary judgment.

### 1. Minnesota Beer Brewers and Wholesalers Act

 Guinness and Mark VII submitted cross–motions for summary judgment on Guinness' claim and Mark VII's counterclaim for declaratory judgment and alleged violations under the Minnesota Beer Brewers and Wholesalers Act. The parties' motions require this court to interpret the statutory provisions. As explained by the Minnesota Supreme Court:

> Statutory interpretation is a question of law. . . . *Ed Herman & Sons v. Russell,* 535 N.W.2d 803, 806 (Minn.1995). The court's role is to discover and effectuate the legislature's intent. *Peterson v. Haule,* 304 Minn. 160, 170, 230 N.W.2d 51, § 7 (1975). In doing so, we construe technical words according to their technical meaning and other words according to their common and approved usage and the rules of grammar. Minn.Stat. § 645.08 (1994). When the language of a statute, so construed, is unambiguous, we apply its plain meaning. *McCaleb v. Jackson,* 307 Minn. 15, 17 n. 2, 239 N.W.2d 187, 188 n. 2 (1976). A statute is ambiguous if it is reasonably susceptible to more than one interpretation. *Tuma v. Commissioner of Economic Sec.,* 386 N.W.2d 702, 706 (Minn. 1986). If the legislature's intent is "clearly manifested by [the] plain and unambiguous language" of the statute, statutory construction is neither necessary nor permitted. *Ed Herman & Sons,* 535 N.W.2d at 806.

*State v. Beaulieu v. RSJ, Inc.,* 552 N.W.2d 695, 701 (Minn.1996); *see Current Tech. Concepts, Inc.v. Irie Enterprises, Inc.,* 530 N.W.2d 539, 543 (Minn.1995) (reciting the standards for statutory interpretation); *Green Giant Co. v. Commissioner of Revenue,* 534 N.W.2d 710, 712 (Minn.1995) (stating that when the statutory language is clear and unambiguous, courts must give effect to the plain meaning of the statute).

 Under the Act, "no brewer shall amend, cancel, terminate or refuse to continue to renew any agreement, or cause a wholesaler to resign from an agreement," unless the brewer has given notice and an opportunity to cure, has acted in good faith, and has good cause for the cancellation, termination, nonrenewal, discontinuance, or forced resignation. *See* Minn.Stat. § 325B.04, subd. 1. A "brewer" means "every licensed brewer or importer of beer located within or without the state of Minnesota, who enters into an 'agreement' with any beer wholesaler licensed to do business into the state of Minnesota." Minn.Stat. § 325B.01, subd. 4. Guinness asserts that it is not liable under the Beer Brewers and Wholesalers Act because, although Guinness concedes that it is a "brewer" to the extent that it is licensed to import beer into Minnesota pursuant to the requirements under Minnesota Statutes, Chapter 340A, Guinness claims that it did not have an "agreement" with Mark VII as set forth under section 325B.01. Guinness therefore argues that the Act, including the termination and notice requirements do not apply to it with respect to Mark VII. Mark VII, however, contends that it has "an agreement" within the purview of the Act and that Guinness violated the statute's remedial provisions. Under the statute, an "agreement" means one or more of the following:

(a) A commercial relationship between a licensed beer wholesaler and a licensed brewer of a definite or indefinite duration, which is not required to be evidenced in writing;

(b) A relationship whereby the beer wholesaler is granted the right to offer and sell a brand or brands of beer offered by a brewer;

(c) A relationship whereby the beer wholesaler, as an independent business, con-

stitutes a component of a brewer's distribution system;

(d) A relationship whereby the beer wholesaler's business is substantially associated with a brewer's brand or brands, designating the brewer;

(e) A relationship whereby the beer wholesaler's business is substantially reliant on a brewer for the continued supply of beer;

(f) A written or oral arrangement for a definite or indefinite period whereby a brewer grants to a beer wholesaler a license to use a brand, trade name, trademark, or service mark, and in which there is a community of interest in the marketing of goods or services at wholesale or retail.

Minn.Stat. § 325B.01, subd. 2. Specifically, Mark VII asserts an "agreement" under subsections (b), (c), and (f)

Mark VII and Guinness contest the relevance of the identity of the party with whom Mark VII had its relationship. Mark VII asserts that the threshold inquiry is whether Mark VII had an "agreement" with someone and that the Act does not specify with whom the wholesaler must have an agreement. In this case, Mark VII claims that it was granted the right to distribute Red Stripe and Dragon Stout; it was a component of D&G's distribution system; and it had the right to use the brand names and trademarks owned by D&G. *See* Minn.Stat. § 325B.01, subd. 2(b), (c), and (f). Thus, in making its argument, Mark VII asserts a connection to D&G and to D&G's products.[2] Guinness challenges Mark VII's reading of the statute and urges that it can only be liable under the Act if it terminated or failed to renew its own agreement with Mark VII. Guinness relies on the definition of "brewer" to support its argument. Under section 325B.01, subdivision 4, the "brewer" must enter into an "agreement." In this instance Mark VII did not "enter" into anything with Guinness. Guinness did not grant any rights to Mark VII. Furthermore, Mark VII was not a component of Guinness' distribution system. Moreover, Guinness did not grant Mark VII a

license to use a brand, trade name, trademark, or service mark. Thus, Guinness did not enter into an "agreement" with Mark VII.

In addition, Guinness asserts that for Mark VII's assertion of a relationship with D&G to be within the purview of the statute, D&G would have to be a licensed brewer under the plain language of the statute, which D&G is not. Mark VII argues that subsections (b), (c), and (f) omit reference to "licensed" and simply refer to "brewer," unlike subsection (a) which refers to a "licensed" brewer or importer. Minn.Stat. § 325B.01, subd. 2. Mark VII challenges Guinness' construction because it would make the reference to "licensed" under subsection (a) mere surplus language, contrary to rules of statutory construction. *See Gale v. Commissioner of Taxation*, 228 Minn. 345, 37 N.W.2d 711, 715 (1949). However, Mark VII's interpretation fails to recognize that the Act specifically defines "brewer" to include a "licensed brewer or importer." Minn.Stat. § 325B.01, subd. 4.

When interpreting the plain meaning of a statute, "statutory definitions of words used elsewhere in the same statute furnish such authoritative evidence of legislative intent and meaning that they are usually given controlling effect." *Sierra Club v. Clark*, 755 F.2d 608, 613 (8th Cir.1985) (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947)). *See Lawson v. Suwanee Fruit and Steamship Co.*, 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949) (recognizing statutory rule of construction that the statutory definitions control the meaning of the words); *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608–09, 76 L.Ed. 1204 (1932) (recognizing "natural presumption" that words used in different parts of the same act are intended to have the same meaning). Because "brewer" under subsections (b), (c), and (f), must comport with the definition of "brewer," which means "licensed brewer or importer", and because D&G is not a licensed brewer, any purported agreement Mark VII has or had with D&G is not an "agreement" covered by the Act or an

---

**2.** Mark VII did not and has not asserted any violations against Labatt.

agreement which Mark VII could assert against Guinness under the statute. See Minn.Stat. § 325B. The context of the statutory language does not require a contrary interpretation.

■ Alternatively, Mark VII argues that the Act applies to Guinness pursuant to section 325B.14 which states that:

[T]he purchaser of a "brewer" as defined in sections 325B.01 to 325B.17 shall become obligated to all of the terms and conditions of the agreement in effect on the date of purchase. "Purchase", as defined for the purposes of sections 325B.01 to 325B.17, shall include, but is not limited to, the sale of stock, sale of assets, merger, lease, transfer or consolidation.

Minn.Stat. § 325B.14.

Mark VII argues that by Guinness' payment of $600,000 to D&G for importation rights and by D&G's payment of $600,000 to Labatt pursuant to the terms of the importation agreement, Guinness "purchased" importation rights such that it is obligated under the statute to all of the terms and conditions of Mark VII's "agreement." In this case, however, there was no assignment of rights to distribute which could be imputed to Guinness. *See Heublein, Inc. v. Alcoholic Bevs. Control Comm'n*, 30 Mass.App. Ct. 611, 571 N.E.2d 430 (1991). The statute requires purchase of the "brewer." Mark VII has come forth with no evidence from which a reasonable jury could find that Guinness "purchased" Labatt or assumed Labatt's obligations with Mark VII pursuant to section 325B.14. Because Guinness is not a "brewer" with an "agreement" with Mark VII, or the "purchaser" of Labatt, Guinness is not within the purview of the Act or its requirements with respect to Mark VII. Thus, Guinness is entitled to summary judgment.

### 2. Promissory or Equitable Estoppel

■ Mark VII asserts a counterclaim of promissory or equitable estoppel against Guinness. Promissory estoppel is an equitable doctrine which implies a contract in law where none exists in fact. *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 372 (Minn.1995) (quoting *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn.1981)). The application of promissory estoppel requires the analysis of the following three elements: 1) was there a clear and definite promise; 2) did the promisor intend to induce reliance, and did such reliance occur; and 3) must the promise be enforced to prevent an injustice. *Ruud*, 526 N.W.2d at 372. In this case, Mark VII has not set forth a clear and definite promise made by Guinness to induce Mark VII's reliance. Because an essential element of the promissory estoppel claim is absent, summary judgment in favor of Guinness is appropriate.

■ "Equitable estoppel is a doctrine designed to prevent a party from taking unconscionable advantage of his own actions. To invoke this doctrine [Mark VII] must show that [Guinness] made representations or inducements upon which [Mark VII] reasonably relied that will cause [Mark VII] harm if estoppel is not applied." *Bethesda Lutheran Church v. Twin City Constr. Co.*, 356 N.W.2d 344, 349 (Minn.Ct.App.1984). Mark VII's equitable estoppel argument relies on its belief that Guinness violated the statutory requirements of the Minnesota Beer Brewers and Wholesalers Act. As with Mark VII's statutory claims, the court concludes that Mark VII's reliance on the Act to support an equitable estoppel argument also fails.

### 3. Tortious Interference with Contractual Relations and Prospective Economic Advantage

■ Mark VII alleges a counterclaim for tortious interference with contract and tortious interference with prospective economic advantage against Guinness. To prevail on the interference with contract claim under Minnesota law, Mark VII must prove the following elements: (1) a contract existed; (2) the alleged wrongdoer had knowledge of the contract; (3) the alleged wrongdoer intentionally interfered with the contract; (4) the alleged wrongdoer's actions were not justified; and (5) damages were sustained as a result. *Sip–Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 832 (8th Cir.1996) (applying Minnesota law). Mark VII cannot rely on mere

speculation to establish a sufficient evidentiary basis for its claims. *Id.* Rather, Mark VII must demonstrate that, but for Guinness' actions, Mark VII would have received the benefit of its contractual relationships. *See In re Appraiser Foundation Antitrust Litigation,* 867 F.Supp. 1407, 1419 (D.Minn.1994) (citing Minnesota authority), *aff'd, National Ass'n of Review Appraisers and Mortg. Underwriters, Inc. v. Appraisal Foundation,* 64 F.3d 1130 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).

 To prevail on its claim for interference with prospective economic advantage, Mark VII must prove that Guinness intentionally committed a wrongful act that improperly interfered with Mark VII's prospective business relationships. *Sip–Top,* 86 F.3d at 832 (applying Minnesota law). Because the law favors competition, Minnesota recognizes the "competitor's privilege" which is set forth in the Restatement as follows:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other.
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

*United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn.1982) (quoting Restatement (Second) Torts § 768 (1979)). Summary judgment is appropriate if there is no evidence that wrongful conduct influenced a prospective customer's decision to enter into a contract. *Sports and Travel Marketing, Inc. v. Chicago Cutlery Co.,* 811 F.Supp. 1372, 1382 (D.Minn.1993).

 In this case, the agreement between D&G and Labatt permitted either party to terminate the importation agreement upon a change in ownership. D&G terminated its agreement with Labatt and entered into an importation agreement with Guinness. The only contract which Mark VII asserts is its "agreement" with D&G by operation of the Minnesota Beer and Wholesalers Act. As discussed by the court, Mark VII's statutory argument that it has an "agreement" with D&G under the Act fails. Similarly, Mark VII has not set forth the existence of an underlying contract for its tort claims. In addition, Mark VII has failed to allege any wrongful conduct by Guinness. Thus, summary judgment in favor of Guinness is appropriate on the tortious interference claims.

### 4. Unjust Enrichment

 Mark VII asserts a counterclaim for unjust enrichment against Guinness. To establish a claim of unjust enrichment, Mark VII must show that Guinness "has knowingly received something of value, not being entitled to the benefit, and under circumstances that would make it unjust to permit its retention." *Southtown Plumbing, Inc. v. Har–Ned Lumber Co., Inc.,* 493 N.W.2d 137, 140 (Minn.Ct.App.1992). As explained by the Minnesota courts:

> A claim for unjust enrichment does not lie simply because one party benefits from the actions of another; rather, the term "unjust enrichment" is used in the sense that the benefit has been gained illegally or unlawfully. *First National Bank of St. Paul v. Ramier,* 311 N.W.2d 502, 504 (Minn.1981). An action for unjust enrichment may be founded upon failure of consideration, fraud, or mistake, or "situations where it would be morally wrong for one party to enrich himself at the expense of another." *Anderson v. DeLisle,* 352 N.W.2d 794, 796 (Minn.App.1984) (citations omitted).

*Holman v. CPT Corp.,* 457 N.W.2d 740, 745 (Minn.Ct.App.1990); *Klass v. Twin City Federal Savings and Loan Ass'n,* 291 Minn. 68,

190 N.W.2d 493, 495 (1971); *Cady v. Bush,* 283 Minn. 105, 166 N.W.2d 358, 361–62 (1969). The record contains no facts suggesting that Guinness benefitted unlawfully or that Guinness was actually and wrongfully enriched. *See, Marking v. Marking,* 366 N.W.2d 386, 387 (Minn.Ct.App.1985) (recognizing that no recovery can be had for unjust enrichment against one not shown to have been wrongfully enriched at another's expense); *Lamson v. Towle–Jamieson Investment Co.,* 187 Minn. 368, 245 N.W. 627, 629 (1932). Thus, summary judgment in favor of Guinness is appropriate on this claim.

## CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. Third–party defendant D&G's motion to dismiss the third–party for lack of personal jurisdiction is granted (Doc. Nos.23, 26). Mark VII's third–party complaint is dismissed without prejudice;

2. Defendant and third–party plaintiff Mark VII's motion to dismiss without prejudice is denied (Doc. No. 38);

3. Plaintiff Guinness' motion for summary judgment is granted (Doc. No. 53) in favor of plaintiff. Mark VII's counterclaims are dismissed with prejudice; and

4. Defendant and third–party plaintiff Mark VII's motion for partial summary judgment is denied (Doc. No. 66).

**LET JUDGMENT BE ENTERED ACCORDINGLY.**