MINNESOTA MINING and MANUFACTURING COMPANY, a Delaware Corporation, Appellant,

v.

NIPPON CARBIDE INDUSTRIES CO., INC., a Japanese Corporation, Appellee.

No. 94–3284.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1995.

Decided Aug. 11, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 11, 1995.

Michael Ciresi, Minneapolis, MN, argued (Deborah J. Palmer, Ronn B. Kreps, and Shelley Carthen Watson, on brief), for appellant.

Louis Touton, Los Angeles, CA, argued (Sally J. Whiteside, Minneapolis, MN, on brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, WOOD, Jr.,* Senior Circuit Judge, and FAGG, Circuit Judge.

RICHARD S. ARNOLD, Chief Judge.

The District Court dismissed a breach-of-contract action brought by Minnesota Mining & Manufacturing Co. (3M) against Nippon Carbide Industries Co., Inc. (NCI), after finding that NCI did not have the necessary minimum contacts with Minnesota to support personal jurisdiction. For reasons set forth below, we reverse and remand for proceedings consistent with this opinion.

I.

Minnesota Mining & Manufacturing Co., through the work of one of its employees, Dr. Joseph McGrath, invented cellular retroreflective sheeting. This sheeting is made up of cellular or encapsulated lenses which retroreflect light and illuminate. signs without temporarily distracting a driver's sight. 3M applied for and received a United States patent, typically referred to as the McGrath Patent. In addition to the United States patent, 3M owns eleven foreign patents for the same invention.[1] Four of those eleven patents are involved in this case.

In the late 1980s, 3M sued Seibu Polymer Chemical Industry Co., Ltd., and Seibulite International, Inc., in France, Australia, Canada, the Republic of China, the United Kingdom, and the United States, alleging that Seibu produced and sold a retroreflective sheeting known as Ultralite Grade (ULG) which infringed upon the McGrath Patent. In trials before the United States International Trade Commission and the High Court

---

* The Hon. Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

1. The foreign patents are from Australia, Austria, Canada, France, Germany, Italy, Japan, Sweden, Switzerland, Taiwan, and the United Kingdom. The Australian, Taiwanese, and United States patents have expired.

of Justice in the United Kingdom, the McGrath patent was held to be valid and infringed. NCI then bought part of the Seibu product line, including the retroreflective sheeting assets. In 1991, 3M and NCI began a series of negotiations in an attempt to resolve 3M's claims of patent infringement.

During those discussions, NCI and 3M personnel conducted several meetings: one meeting in Minnesota, one in Los Angeles, one in Honolulu, and two in Tokyo. Also there were extensive phone calls, letters, and facsimiles between Japan and St. Paul, Minnesota, 3M's headquarters. Drafts of an agreement were sent back and forth between the two companies as they were reviewed and edited. When the language of the contract finally had been agreed upon, the contract was signed by NCI and then sent to 3M. The contract became effective and binding upon the parties on the date 3M executed it in St. Paul, Minnesota, April 29, 1992.[2]

After entering into this agreement, NCI developed and began making and selling a retroreflective-sheeting product called Nikkalite Ultralite Special Grade Sheeting (ULS). Recognizing that this new sheeting related to the earlier settlement discussions between the parties, NCI contacted 3M in September of 1992 to discuss whether ULS fell within the terms of the April 1992 contract.

This second set of negotiations took place over a year and a half with at least eight meetings in St. Paul and three other meetings in Tokyo. Some testing of the ULS sheeting occurred in Minnesota in the joint presence of NCI and 3M scientists. Throughout this time, numerous phone calls, letters, and facsimiles were sent between the

two companies' principal places of business. Also, 3M found out that NCI had continued selling its surplus of ULG after it had executed the agreement. NCI states that 3M knew and orally agreed that NCI could sell out its surplus inventory.

When it became clear that the negotiations were not going to resolve 3M's and NCI's dispute about ULS and the surplus ULG, 3M filed this diversity action on March 7, 1994, against NCI. In Count I of the complaint, 3M claims that NCI breached the 1992 settlement agreement by continuing to make, use, or sell ULG sheeting in France, Italy, and Germany, where 3M owns unexpired equivalents to the McGrath Patent. Count II alleges that NCI has continued to make, use, or sell ULS, an encapsulated-lens retroreflective sheeting, in France, Germany, and Japan, where 3M has unexpired McGrath Patents. ULS, 3M alleges, is Covered Retroreflective Sheeting within the meaning of the agreement, so that by selling ULS, NCI has again violated the agreement.

NCI is a Japanese company with its principal place of business in Tokyo. NCI does not have an office or a mailing address in Minnesota and is not licensed to do business in the state. NCI does not have a bank account or any property in Minnesota. NCI does not have any employees working in Minnesota; NCI's employees have visited Minnesota only to meet with 3M during the negotiations we have described. 3M is a Delaware corporation, with its principal place of business in St. Paul, Minnesota. Each corporation operates internationally.

## II.

■ To determine whether a court has personal jurisdiction over a nonresident de-

---

2. The pertinent parts of the agreement state:

1.1 "McGrath Patent" shall mean U.S. Patent No. 4,025,159 or any counterpart to that patent in another country.

. . . .

1.3 "ULG Sheeting" shall mean any encapsulated-lens retroreflective sheeting which was manufactured by Seibu and marketed as Ultralite Grade retroreflective sheeting.

1.4 "Covered Retroreflective Sheeting" shall mean encapsulated-lens retroreflective sheeting which in the jurisdiction where it is made used or sold is covered by an unexpired McGrath Patent.

. . . .

2.1 NCI agrees that it will not make, use or sell Covered Retroreflective Sheeting, including ULG Sheeting, in any Patent Country as long as 3M owns an unexpired McGrath Patent in that country.

. . . .

3.1 3M agrees to withdraw all litigation claims now being asserted against NCI with respect to the McGrath Patent, and further agrees that it will not seek from NCI any remedy for the acts of infringement alleged by 3M in the pending litigation or any recovery of costs or any other monetary recovery.

fendant, we ask two questions: (1) whether the applicable state long-arm statute (Minn. Stat. § 543.19 (1988)) is satisfied; and (2) whether a court's exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir.1995).

■ Minnesota has consistently held that its legislature intended the long-arm statute to have the maximum extraterritorial effect allowed under the Fourteenth Amendment. *Domtar, Inc., v. Niagara Fire Insurance Co.*, 518 N.W.2d 58, 60–61 (Minn.App.1994), *aff'd*, 533 N.W.2d 25 (Minn.1995). Because Minnesota has interpreted its long-arm statute to be coextensive with the limits of due process, we turn to consider whether the assertion of jurisdiction over this defendant offends due process.

■ Under the Due Process Clause, jurisdiction over a nonresident is proper only if the defendant has such minimum contacts with the forum state that the maintenance of a suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Whether the minimum contacts are sufficient depends on whether the defendant, by some act, "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). This test is met if a defendant has deliberately engaged in activities, such as having created continuing obligations, within a state, and such actions invoke the benefits and protection of a state's laws. *Id.* at 475–76, 105 S.Ct. at 2183. One of the essential foundations of personal jurisdiction exists when a controversy is related to or arises out of a defendant's contacts with the forum, and there is a relationship among the defendant, the forum, and the litigation. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 nn. 8 & 9, 104 S.Ct. 1868, 1872 nn. 8 & 9, 80

L.Ed.2d 404 (1984); *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977).

■ Once it has been decided that a defendant purposefully established contacts with a forum state, these contacts must be considered in light of other factors to determine whether the assertion of personal jurisdiction would agree with fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. at 320, 66 S.Ct. at 160. There are three primary factors which are to be considered: (1) the nature and quality of the contacts, (2) the quantity of the contacts, and (3) the relation of the cause of action to the contacts. *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir.1994). In addition to those considerations, there are two secondary factors as well: the interest of the forum state in the litigation and the convenience or inconvenience to the parties. *Thompson v. Ecological Science Corp.*, 421 F.2d 467, 469 (8th Cir.1970). Because the first three factors are closely interrelated, we consider them together.

In 1991, 3M notified NCI that it had purchased a product line that was in the midst of several patent-infringement suits with 3M. NCI and 3M then entered into extensive negotiations to discuss a way to settle the disputes. Part of those negotiations took place in Minnesota. Although the initial contact was from 3M to NCI, NCI was not tricked into Minnesota by the actions of 3M. NCI came voluntarily to Minnesota with the business purpose of terminating on-going litigation. Following the meeting in Minnesota and several meetings elsewhere, NCI and 3M continued to communicate until they came to an agreement, which was finally executed in Minnesota. Under the agreement, both companies had continuing obligations to the other—NCI was not to sell any more encapsulated-lens sheeting, and 3M would not pursue its suits.

NCI argues that it did not enter the state to promote business in Minnesota, but solely to settle a foreign dispute involving NCI's foreign activities and 3M's foreign patents. Therefore, NCI asserts, even though 3M argues that this case is about a broken con-

tract, the essence of the case is foreign, and the foreign nature of the action should lead this Court to conclude that personal jurisdiction is not proper. The central issue before this Court, however, is personal jurisdiction, not choice of law. See *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). The question of the complexity of applying four nations' patent laws presents itself in the course of litigation only after jurisdiction over the defendant is established. Therefore, we must determine whether Minnesota has jurisdiction before we consider what law will be applied to this case. It often happens that a forum with jurisdiction must apply the law of another State or country.

■ Here, the defendant's activities in Minnesota were directed toward the consummation of the contract in dispute. NCI entered Minnesota with the purpose of settling several lawsuits in several different countries. The outcome of NCI's negotiations with a Minnesota resident was a contract. It is that specific contract, the entire result of NCI's discussions with 3M, that is now at issue. By coming into the State of Minnesota and by negotiating a contract which could be enforced under the laws of Minnesota, NCI purposefully availed itself of the laws of the State. NCI argues that its contacts with Minnesota are insignificant because the essence of the dispute is foreign, but "[a]n ordinarily insignificant contact with a state becomes constitutionally significant when it gives rise to the claim involved in the lawsuit." *Thompson*, 421 F.2d at 470 (8th Cir. 1970) (citations omitted). Here, the very suit is for breach of the contract that was made in Minnesota.

The contacts between 3M and NCI in Minnesota were significant. The result of those contacts was a contract which demanded on-going duties from both of the parties. The contract was made in Minnesota, and it is the law of Minnesota which will govern the contract. Although the mere making of a contract with a resident is not enough to confer jurisdiction, see *Burger King*, 471 U.S. at 475–76 n. 18, 105 S.Ct. at 2183–84 n. 18, much more occurred here. As the Supreme Court has noted, "even a single act can support jurisdiction," so long as it creates a substantial connection with the forum. *Ibid.*

NCI argues that the only reason it entered Minnesota was to reach a settlement agreement with 3M, and Minnesota has a policy of protecting those who attempt to settle disputes without litigation. NCI continues that if we find jurisdiction exists, then Minnesota will become a jurisdictional trap for those who enter solely to negotiate settlements. See *Tol–O–Matic v. Proma Produkt–Und Marketing Gesellschaft*, 690 F.Supp. 798 (D.Minn.1987); *Conwed Corp. v. Nortene, S.A.*, 404 F.Supp. 497 (D.Minn.1975).

The cases NCI relies on involved negotiations which did not result in a completed contract. Once the parties resolve their dispute, and embody that resolution in a contract with each other, and that contract is executed in Minnesota, Minnesota cannot be considered a jurisdictional trap. By that point the defendant is no longer merely negotiating. Rather, the defendant has purposefully availed itself of the privilege of conducting activities within the forum and has made a contract in that forum. These contacts, which become the subject matter of a subsequent cause of action, may serve as the basis of jurisdiction.

It remains to consider the two secondary factors—the interest of Minnesota in having the case tried there and the convenience of the parties. The District Court took the view that these factors were evenly balanced and did not cut either way. We agree and therefore find it unnecessary to discuss the two secondary factors.

These factors may become relevant on remand, however. NCI's motion to dismiss was based on two grounds: lack of jurisdiction over the person and *forum non conveniens*. Because the District Court granted the motion to dismiss on the ground of lack of jurisdiction over NCI's person, it did not reach the question of *forum non conveniens*. On remand, it will be appropriate for NCI to renew its motion to dismiss on this latter ground, and for the District Court to consider it. The issue of *forum non conveniens* is addressed, in the first instance, to the sound discretion of the District Court.

The judgment is reversed, and the cause remanded for further proceedings consistent with this opinion.