*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SUNCOKE ENERGY INC., fka Sun Coke Company,

        *Plaintiff-Appellant,*

      *v.*

MAN FERROSTAAL AKTIENGESELLSCHAFT; MAN FERROSTAAL DO BRASIL COMERCIO E INDUSTRIA LTDA.,

        *Defendants-Appellees.*

No. 08-5414

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 07-00006—Thomas A. Varlan, District Judge.

Argued: January 15, 2009

Decided and Filed: April 20, 2009

Before: MERRITT, ROGERS, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Richard W. Foltz, Jr., PEPPER HAMILTON, Philadelphia, Pennsylvania, for Appellant. Sydney B. McDole, JONES DAY, Dallas, Texas, for Appellees. **ON BRIEF:** Richard W. Foltz, Jr., PEPPER HAMILTON, Philadelphia, Pennsylvania, W. Kyle Carpenter, WOOLF, McCLANE, BRIGHT, ALLEN & CARPENTER, Knoxville, Tennessee, for Appellant. Sydney B. McDole, JONES DAY, Dallas, Texas, W. Thomas Dillard, Wayne A. Ritchie II, RITCHIE, DILLARD & DAVIES, Knoxville, Tennessee, for Appellees.

      MERRITT, J., delivered the opinion of the court, except as to Part III, and delivered an opinion as to Part III. WHITE, J. (pp. 10-13), delivered a separate concurring opinion. ROGERS, J. (pp. 14-17), delivered a separate opinion, dissenting in part.

1

_____

## OPINION

_____

MERRITT, Circuit Judge.  This is a diversity action for injunctive relief seeking the return of confidential trade information generated and provided by SunCoke Co. of Knoxville,Tennessee to the defendant, MAN Ferrostaal, a German engineering and construction company.  Relying on the Tennessee long-arm statute, SunCoke brought suit in federal court in Knoxville, where its principal place of business is located.  The District Court dismissed for lack of personal jurisdiction.  It held that the activities of the German corporation did not create a sufficiently "substantial connection with the forum state," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985), to meet the due process standard of "fair play and substantial justice," *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 116 (1982).  This broad constitutional standard requires us to consider all of the facts concerning the business relationship at issue to determine whether the exercise of federal jurisdiction is reasonable under the circumstances.[1]  We believe that the defendant's

_____

[1]The *Restatement (Second) of Judgments* and the *Restatement (Second) of Conflict of Laws* describe the concept of personal jurisdiction by listing a total of eleven broad factors to be considered.  For example, § 5 of the *Restatement (Second) of Judgments* lists the following factors relevant here:

§ 5.  Jurisdiction Over Persons

A state may exercise jurisdiction over a person who has a relationship to the state such that the exercise of jurisdiction is reasonable . . . .

(1) A state has power to exercise judicial jurisdiction over an individual on one or more of the following bases . . .

(g) doing business in the state
(h) an act done in the state
(i) causing an effect in the state by an act done elsewhere
(j) ownership, use or possession of a thing in the state
(k) other relationships to the state which make the exercise of judicial jurisdiction reasonable.

. . . .

REPORTER'S NOTE:

. . . .

A minimal involvement of the defendant in activity in the forum is required.  *See World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).  Assuming such an involvement, the question of territorial jurisdiction is to be resolved

dealings with SunCoke in Tennessee were substantial enough to meet the due process standard, and hence we reverse and remand the case for further proceedings.

**I.**

The two parties entered into a detailed contract in April 2001, focused on the disclosure of the confidential trade information, which the parties described as "highly valuable." The stated use of the information by Ferrostaal was to develop coke and related co-generation facilities in Brazil. In anticipation of possible future disputes, the contract provided a set of equitable remedies in case of misuse of the information,[2] and included two distinct forum-selection provisions, one for equitable claims and the other for legal claims. As to equitable claims, the contract provides that "a claim for equitable relief . . . may be brought to any court of competent jurisdiction," while other claims are to be arbitrated in Paris under certain international rules of arbitration.[3]

In this equitable action by the Tennessee corporation against the German corporation, the parties have treated the contract forum-selection clause for equitable relief — calling for adjudication in "any court of competent jurisdiction" — to mean any court with personal jurisdiction under the "minimum contacts," due process test of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). The defendant was not personally served with process in the forum state, so the question before us is whether the activities of the defendant with respect to the confidential trade information meet the

---

by reference to convenient administration of justice in all its aspects, including alternative forums, the plaintiff's connection with the forum state, and the consequences with respect to joinder of other parties.

[2]Section 6 of the contract provided: *Remedies*. The Receiving Parties acknowledge and agree that (i) the Confidential Information embodies substantial and highly valuable know how that is proprietary to the Disclosing Party; (ii) the Disclosing Party does not have an adequate remedy at law, and (iii) the Disclosing Party shall be irreparably harmed if any of the provisions of this Agreement are breached. Accordingly, in addition to any other remedy to which the Disclosing Party may be entitled at law or in equity, the Receiving Parties agree that the Disclosing Party shall be entitled to temporary and permanent injunctive relief to prevent breaches of this Agreement, and to specifically enforce this Agreement.

[3]Section 9 of the contract provided: *Governing Law: Arbitration of Disputes*. This Agreement shall be governed by and construed in accordance with the laws of England (United Kingdom) applicable to agreements made and performed therein. Other than a claim for equitable relief, which may be brought to any court of competent jurisdiction, all disputes arising out of this Agreement shall be settled by arbitration in accordance with the rules of the International Chamber of Commerce ("ICC"), Paris. Any such arbitration shall be take place in Paris, France.

"minimum contacts" test that would justify finding personal jurisdiction in the Tennessee federal court. We conclude that the test is satisfied primarily because of defendant's travels to Tennessee and its communications sent to and received from Tennessee about the proprietary information that originated in Tennessee and was to be returned there under the contract between the parties. The parties contemplated in their contract that litigation for injunctive relief might become necessary. A federal court in the United States with the most contacts with the transaction in question would be one logical place to resolve the dispute. The contract itself gives an explanation of differences between law and equity that contemplates a lawsuit brought to a "competent" court presumably familiar with this common law distinction and the various forms of injunctive relief and specific performance referred to in the contract.

Concerning visits to Tennessee by Ferrostaal employees, there is a conflict as noted by the District Court:

> A Sun Coke representative, Alison Grant, reports that Ferrostaal employees visited Tennessee on several occasions. Specifically, Marco Antonio Marcial, Villian Oliverira, Renata Souza, and Marcos Daré visited Tennessee in July 2001; Joern Walter and Jan Krull visited Tennessee in November 2001; and Howard Barnes, Helmut Kucken, Marco Antonio Marcial, and Jan Krull visited Tennessee in September 2002. Ms. Grant does not know which of these Ferrostaal representatives were from Ferrostaal Germany. Ferrostaal Germany asserts that representatives from Ferrostaal Germany were only present in Tennessee during the September 2002 visit. Additionally, Ms. Grant states that there were multiple phone conversations and email messages from Ferrostaal Germany to Sun Coke employees in Knoxville to arrange meetings.

*Sun Coke v. MAN Ferrostaal do Brasil Commercio e Industria Ltda.*, 543 F.Supp.2d 836, 838 (E.D. Tenn. 2008) (citations omitted). There is no conflict concerning the fact that the confidential trade information, which related to "heat recovery Coke oven technology," was sent by SunCoke in Tennessee to Ferrostaal in Essen, Germany, its headquarters. The information was sent by computer network and website.

By 2005, SunCoke believed that Ferrostaal was improperly disclosing its protected information to third parties and had improperly put on its website a photograph

showing its "proprietary designs."  In October 2005, SunCoke filed an arbitration proceeding in Paris and demanded that all of its confidential information be returned to it.  In late 2005, during the pendency of the arbitration proceeding, a high executive of Ferrostaal, Dr. Wolfgang Knothe, traveled to Knoxville for discussions concerning the return of the information and the settlement of their dispute with Mr. M.H.R. Dingus, the president of SunCoke.  The principals of the two companies then exchanged letters.  Dr. Knothe's letter says that they had settled the controversy in their Knoxville meeting.[4] Mr. Dingus's reply responds that the parties must take further steps to implement the understanding arrived at in the Knoxville meeting.[5]

---

[4]Dr. Knothe's letter reads:

Dear Mr. Dingus:

After my safe return to Germany, I want to thank you very much for the warm welcome extended to me during my recent visit to the United States.

You and I have discussed the problems relating to the alleged breach of confidentiality and the arbitration proceedings instituted against us and our Brazilian subsidiary.  Please allow me to summarize my understanding of the terms reached during our talks:

1.  We invite you to send one of your management delegates to our Esson headquarters and/or to our Brazilian offices with the aim to provide you with the necessary comfort that such alleged breach of confidentiality has not occurred.

2.  Without hereby acknowledging a breach, we and our Brazilian subsidiary withdraw from the heat recovery coke oven project for the CSA ThyssenKrupp Atlantic Steel plant which we pursued together with Udhe GmbH.  It is understood that the withdrawal would not extend to other projects within the CSA ThyssenKrupp Atlantic Steel plant project.

3.  I have reorganized the structure in such a way that Mr. Jürgen Both and Mr. Stefan Kratz shall be the points of contact for your company.  In case of execution of major projects I suggest to form a steering committee in which the two of us should sit to discuss and implement strategic decisions.

4.  You stop with immediate effect the arbitration proceedings against us and our Brazilian subsidiary and would not begin any new proceedings with respect to the above mentioned project.

Provided I have correctly summarized the agreement reached I would kindly ask you to countersign and return a copy of this letter to us before the 2nd December 2005, being the last day of the 30-day period granted by the ICC.

Best regards,
MAN Ferrostaal Aktiengesellschaft

[5]Mr. Dingus's reply reads:

Dear Wolfgang:

    I enjoyed our recent meeting and appreciate your response to the claims raised

The District Court describes the activities of the parties thereafter as follows:

On April 21, 2006, Sun Coke again requested that Ferrostaal return of its [sic] confidential information as defined in the MOU and confidentiality agreement and requested that Ferrostaal remove all depictions of Sun Coke's proprietary designs from its website. By cover letters dated September 1, 2006, March 9, 2007, and September 17, 2007, Ferrostaal Germany returned some of the information that it had received from Sun Coke. Ferrostaal Germany invited Sun Coke to call if there were any questions about the return of the information, but Sun Coke has never contacted Ferrostaal Germany to verify or discuss the return of any of the information.

On January 8, 2007, Sun Coke filed the instant action requesting that Ferrostaal be required to (1) return the proprietary information; (2) certify it has done so and describe the means taken to assure no copies have been retained, nor other improper uses made of the proprietary information; and (3) permit Sun Coke access to Ferrostaal's

---

in our arbitration demand.

After carefully reviewing your November 28th letter, we acknowledge the following:

1. Based upon your representations that Ferrostaal (namely MAN Ferrostaal Aktiengesellschaft and MAN Ferrostaal do Brasil Comercio e Industria Ltda.) has (i) withdrawn from participation in the coke plant portion of the Seperiba project on behalf of Udhe GmbH, and (ii) has not breached any of its confidentiality obligations in respect of Sun Coke Company, Sun Coke will withdraw, without prejudice and without waiving any of its rights, its pending demand for arbitration. Provided those representations are confirmed, we do not anticipate re-filing that arbitration demand.

2. Based upon your proposal, Sun Coke's team will visit the offices of your Brazilian affiliate for the purpose of determining whether Ferrostaal has breached its confidentiality obligations. In addition to reviewing all materials submitted by Ferrostaal to Udhe, our team will review Ferrostaal's procedures for maintaining the secrecy and security of Sun Coke's proprietary information and know-how, including its document control procedures and confidentiality agreements with contractors and suppliers for the Vitoria project. Richard Westbrook will head our team, and I have asked him to contact Christoph Schlumbom to coordinate our team's visit. Legal representatives will not be included as members of our team. Of course, we reserve the right to further visits, including visits to your Essen office, as reasonably required.

3. We appreciate your designation of Mr. Both and Mr. Kratz as points of contact, and your proposal for the two of us to meet and discuss significant issues. However, we believe that the formation of a formal steering committee is not necessary at this time.

Once again, thank you for your visit and your consideration of these issues. I look forward to meeting with you again in the near future.

> Essen headquarters and Brazilian offices to confirm all proprietary information has been returned.

*Sun Coke*, 543 F.Supp.2d at 839 (citations omitted).

## II.

In deciding this case against jurisdiction, the District Court relied heavily on an intellectual property case in which a Michigan company sued a Swiss company for misappropriation of confidential information released under a contract negotiated in Switzerland — a contract which expressly provided that "jurisdiction for this contract is Bern, Switzerland." *Int'l Tech. Consultants, Inc. v. Euroglass S.A.*, 107 F.3d 386 (6th Cir. 1997). Relying on language from a Supreme Court case interpreting *International Shoe* to allow "potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980), the *International Technologies* court held that the forum-selection clause establishing jurisdiction in Bern, Switzerland, was strong evidence that Michigan lacked a substantial basis for jurisdiction against the Swiss company. In the present case, instead of limiting jurisdiction to a court in Essen, Germany, and foreclosing jurisdiction elsewhere, the contract between SunCoke and Ferrostaal allows equity jurisdiction enjoining misuse of intellectual property in any court of "competent jurisdiction." This means any court in which the "connection" with the dispute is sufficient to satisfy the standard of "fair play and substantial justice."[6]

The District Court also erroneously foreclosed the use of the late-2005 discussion in Knoxville which led to the exchange of correspondence and the alleged agreement between the principals of the two companies regarding the return of SunCoke's confidential information. Based on language from *Nationwide Mutual Insurance Co. v. Tryg International Insurance Co.*, 91 F.3d 790, 796 (6th Cir. 1996), the Court concluded that the activities of Dr. Knothe in Tennessee leading to the alleged new agreement may

---

[6]*See* footnote 1 *supra.*

not be used in the calculus for establishing jurisdiction. Although the parties appear to differ as to the nature of their new understanding in November 2005, Dr. Knothe states in his letter that an agreement was "reached during our talks" consisting of four points which he then enumerates. This alleged new agreement in Knoxville and the activities of the parties leading to it and resulting from it should count as contacts in the determination of whether it is fair for Tennessee courts to act as a competent jurisdiction for resolving the dispute arising from the alleged contract that the parties formed there.

**III.**

The author of this opinion is doubtful that there is a rational basis for the dicta in the *Nationwide Mutual Insurance* case that in effect converts Federal Rule of Evidence 408 ("conduct or statements made in compromise negotiations" may not be used "to prove liability for, invalidity of, or amount of a claim") into a rule of personal jurisdiction under the Due Process clause. Why should these contacts be discounted for the entirely separate question of constitutional contacts? We should not constitutionalize this rule of evidence.

In addition, we need not decide whether all of the contacts with Tennessee prior to the late-2005 discussions in Knoxville and follow-up letters are sufficient alone to establish Tennessee as a "competent jurisdiction" under the forum-selection and Due Process clauses. We believe that the 2005 activities are sufficient to eliminate any serious problem of fairness and substantial justice when we add to the 2005 activities the prior visits, the generation of the confidential information in — and the obligation to return it to — Tennessee, the foreseeability of a dispute arising from this obligation, and the use of actual concepts of English and American law as the remedy for such disputes.

The fact that SunCoke divided its case into two separate claims — one for breach of the original 2001 contract and one for breach of the 2005 contract — should not defeat federal jurisdiction over the entire case. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 24 ("What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation,

whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties expectations or business understanding or usage.").**7** It would not be an efficient use of either the parties' or the court's time to handle the two counts of the complaint separately as though they were unrelated. Fairness and substantial justice support the view that personal jurisdiction over a set of highly integrated transactions between the same parties arising from the same subject matter and legal theory should be adjudicated as a whole and not piecemeal. *See United States v. Cal. and Or. Land Co.*, 192 U.S. 355, 358 (1904) ("But the whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time.").

Although we do not agree entirely as to the reasoning leading to the result, Judge White and I agree that the District Court has personal jurisdiction on remand over the entire case.

## IV.

For these reasons, the decision of the District Court is reversed, and the case is remanded for further proceedings.

---

**7**Judge Rogers' separate opinion barring personal jurisdiction over claim 1 based on the 2001 contract but allowing claim 2 to go forward is based on a metaphysical distinction that would likely leave the District Court puzzled as to what precise issue is being tried and what evidence is admissible. The 2005 agreement allegedly replaces the 2001 agreement in part. But without having all the facts before us in this appeal, it is not possible to tell the nature of the modification or how the two agreements fit together. That is why the RESTATEMENT's "pragmatic" approach based in part on judicial efficiency seems best. After all, we are dealing with the "equitable" powers of the court which are inconsistent with fine, formalistic distinctions separating two interlocking contracts that must be read together in a factual context not known to us at the present time.

––––––––––––––––

**CONCURRENCE**

––––––––––––––––

WHITE, Circuit Judge, concurring. I join my colleagues in the conclusion that the district court erred in finding that it could not constitutionally exercise personal jurisdiction over Ferrostaal Germany (Ferrostaal) in relation to SunCoke's claim for breach of the alleged 2005 agreement. *Nationwide*, *supra*, is properly distinguished on the basis that SunCoke alleges that a new contract was formed as a result of the negotiations in Tennessee and seeks enforcement of that contract. *Cf. Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co.,* 63 F.3d 694, 698 (8th Cir. 1995).

I join parts I and II of Judge Merritt's opinion. However, I agree with Judge Rogers that personal jurisdiction must be proper as to each claim, and that the two contract claims do not share a common nucleus of facts. Thus, personal jurisdiction as to the claim based on the 2001 confidentiality agreement must be established in its own right. Because I conclude that SunCoke has established the requisite minimum contacts as to this claim as well, I concur in the judgment that Ferrostaal is subject to personal jurisdiction as to SunCoke's claim for breach of the 2001 agreement.

SunCoke, a corporation with its principal place of business in Knoxville, Tennessee (Compl. ¶ 4), entered into a confidentiality agreement with Ferrostaal on April 2, 2001, under which it would disclose its confidential, proprietary, or otherwise nonpublic information to Ferrostaal so that Ferrostaal could "perform certain services on behalf of SunCoke Company and its affiliates . . . related to the development and installation of a heat recovery coke plant and related cogeneration facility in Brazil pursuant to a 'Memorandum of Understanding' [MOU] to be entered into" between SunCoke and Ferrostaal. J.A. 23. The confidentiality agreement was specifically and solely addressed to the protection, limited use, and return of SunCoke's and its affiliates' confidential information and materials. Although related to the underlying MOU and incorporated into the MOU by reference (J.A. 67), the confidentiality agreement is a

separate contract in its own right, and is the agreement SunCoke seeks to compel Ferrostaal to specifically perform.

While the MOU itself has little connection to Tennessee, the confidentiality agreement has a significant connection to Tennessee. The subject of the confidentiality agreement was not a contract to be performed in Brazil, but rather confidential information and materials originating mainly in Tennessee and belonging to a business with its principal offices in Tennessee. By the terms of the confidentiality agreement, which was written on SunCoke's Tennessee letterhead, Ferrostaal acknowledged that "the Confidential Information embodies substantial and highly valuable know[-]how that is proprietary to [SunCoke]" and that SunCoke "shall be irreparably harmed if any of the provisions of the Agreement are breached." J.A. 25 (Agreement ¶ 6). Importantly, the agreement provided that Ferrostaal "will promptly return all Confidential Information and other materials furnished by [SunCoke] to [defendant] (including copies thereof regardless of format) upon the occurrence of" certain prescribed events, including "the termination of the Memorandum of Understanding or any agreements entered into by such parties or their affiliates pursuant to such Memorandum of Understanding" or "the conclusion of the Project." J.A. 24-25 (Agreement ¶ 4). Thus, final performance of the contract required that the materials be returned to SunCoke. Indeed, the record reflects that when Ferrostaal eventually returned certain confidential materials and drawings—doing so explicitly pursuant to the 2001 confidentiality agreement—it returned them by courier to SunCoke in Tennessee. *See* J.A. 88.

On its own, the existence of a contract would be insufficient to confer personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). Rather, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," are to be considered to determine whether "the defendant purposefully established minimum contacts within the forum." *Id.* at 479. In executing the confidentiality agreement, the parties contemplated a continuing relationship. By the very terms of the agreement, defendant knew it was contracting with a company in Tennessee, understood the value of the confidential

information to this Tennessee company, and anticipated a course of dealing that would involve accessing information located in Tennessee, protecting that information for the benefit of a Tennessee company, and returning the information to Tennessee. The "contemplated future consequences" of a failure to protect or return that information were expressly stated—irreparable injury to the Tennessee company and the possible commencement of an equitable action in a court of competent jurisdiction.

Moreover, the confidentiality agreement enabled an ongoing relationship between the parties. *See CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1265 (6th Cir. 1996) (distinguishing between "a relationship intended to be ongoing in nature" and a "one-shot affair"). With this agreement in place, SunCoke provided and facilitated Ferrostaal's access to proprietary information and materials through computer access to SunCoke's Tennessee-maintained website[1] and visits to its United States facilities. Although such visits did not occur in Tennessee, Ferrostaal's arrangements for its United States visits were made through SunCoke's Tennessee office. And although Ferrostaal argues that any breach of the confidentiality agreement would have occurred outside Tennessee because any failure to return the information occurred outside Tennessee, and that any misuse or misappropriation occurred outside Tennessee, the gravamen of SunCoke's complaint is the failure to return the confidential materials to Tennessee as contemplated by the confidentiality agreement.

The facts and circumstances, in the aggregate, establish sufficient minimum contacts with Tennessee to support the exercise of personal jurisdiction over a claim for equitable relief under the confidentiality agreement. Traditional notions of fair play and substantial justice would not be offended by such an exercise. *See Floratine Prods. Group, Inc. v. Brawley*, 282 F. Supp. 2d 798, 801 (W.D. Tenn. 2003) ("Tennessee has a substantial interest in protecting the contracts upon which its citizens rely, especially when those contracts create continuing relationships.") (citing *J.I. Case Corp. v. Williams*, 832 S.W.2d 530, 533 (Tenn. 1992)); *see also Burger King*, 471 U.S. at 475-76

---

[1] Given that the website was maintained at SunCoke's Tennessee office, I do not find it significant that the server was located in Houston, Texas.

(observing that "where the defendant deliberately . . . has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there") (citation and quotation marks omitted).

For these reasons, I conclude that SunCoke has established the requisite minimum contacts to support the constitutional exercise of personal jurisdiction over Ferrostaal as to each of SunCoke's two claims for equitable relief.

_____

**DISSENTING IN PART**

_____

ROGERS, Circuit Judge, dissenting in part.   Because there is not personal jurisdiction over Ferrostaal on SunCoke's claim for breach of the 2001 contract, I would uphold the dismissal of that claim.   Under *Nationwide Mutual Insurance Co. v. Tryg International Insurance Co.*, 91 F.3d 790, 796 (6th Cir. 1996), the parties' settlement negotiations cannot be used as a contact to establish personal jurisdiction on the 2001 contract.  Without that contact, there is insufficient connection to the forum on that claim and it should be dismissed for want of jurisdiction.

There is not personal jurisdiction over Ferrostaal on one of SunCoke's claims, and "[p]ersonal jurisdiction . . . must be proper as to each claim."  Jack H. Friedenthal, et al., *Civil Procedure* § 6.6, at 368 (4th ed. 2005); *see also, e.g.*, *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006); *Remick v. Manfredy*, 238 F.3d 248, 255-56 (3d Cir. 2001); *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999).  SunCoke brought two claims: breach of the 2001 contract and breach of the 2005 settlement contract.   There is only personal jurisdiction over Ferrostaal on the latter.

There is personal jurisdiction on the 2005 settlement contract claim because Ferrostaal's "negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985), establish minimum contacts with Tennessee.  By coming to Tennessee to negotiate, Ferrostaal "purposefully directed" its activities toward Tennessee residents, "and the litigation result[ed] from alleged injuries that arise out of or relate to those activities."  *Burger King*, 471 U.S. at 473 (citations and internal quotations omitted).  Ferrostaal's activity in the state was not "random" or "fortuitous," *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984), nor was the travel to Tennessee a "jurisdictional trap," as described in *Minnesota Mining & Manufacturing Co. v. Nippon Carbide Industries Co.*, 63 F.3d 694, 698 (8th Cir. 1995).  The settlement

contract contemplated future consequences relevant to Tennessee: Ferrostaal agreed to allow SunCoke representatives to travel from Tennessee to Ferrostaal offices to investigate the alleged misappropriation of confidential information. Parties who "create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (citation and internal quotations omitted).

There are not, however, minimum contacts to establish personal jurisdiction over Ferrostaal on the 2001 contract claim. The settlement negotiations are a contact only for the purposes of the settlement contract itself[1]—*Nationwide* precludes using the negotiations as a contact to establish personal jurisdiction on a claim for the original 2001 contract. 91 F.3d at 796; *see also Iowa Elec. Light & Power Co. v. Atlas Corp.*, 603 F.2d 1301, 1302 n.2 (8th Cir. 1979); *Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc.*, 239 F.2d 502, 508-09 (4th Cir. 1956). Ferrostaal's other contacts with Tennessee are not sufficient to warrant jurisdiction under *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

First, Ferrostaal did not purposefully avail itself of the privilege of acting in Tennessee, as required by *Southern Machine*, 401 F.2d at 381. Connection to Tennessee is minimal: The 2001 contract was negotiated in Florida and the contract dealt with services in Brazil. In 2002, Ferrostaal employees visited SunCoke's Tennessee offices for one day to discuss the project in Brazil. The parties arranged the trip via telephone, email, and facsimile. Ferrostaal electronically accessed information on SunCoke's website (maintained in Tennessee) via a remote server in Texas. The breach occurred in Brazil, where Ferrostaal allegedly misappropriated SunCoke's intellectual property. Of these contacts, the 2002 visit provides the strongest connection to Tennessee, and the trip lasted one day and concerned actions in Brazil. The communications between the parties add little weight as "the only reason the communications . . . were directed [at the forum] was that [plaintiff] found it convenient to be present there." *Int'l Techs.*

---

[1] In considering settlement contacts, the Eighth Circuit in *Minnesota Mining & Manufacturing Co.*, 63 F.3d at 698, explicitly distinguished cases where the suit was over the underlying contract that the parties were trying to settle as opposed to a suit over a resulting settlement contract.

*Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 395 (6th Cir. 1997). The absence of other contacts is notable: Ferrostaal is not licensed to operate in Tennessee, provides no services there, and maintains no offices or property there. These contacts did not provide a "substantial connection" with Tennessee that creates a reasonable anticipation of being "haled into court there." *Burger King*, 471 U.S. at 474-75 (citation omitted).

Second, the 2001 contract claim did not arise from Ferrostaal's actions in the forum state, as considered in *Southern Machine*, 401 F.2d at 381. "[T]he operative facts of the controversy," *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1267 (6th Cir. 1996), occurred in Brazil when Ferrostaal supposedly misappropriated confidential information. The claim did not arise from contacts with Tennessee, nor did it have "substantial connection with the defendant's in-state activities." *Southern Machine*, 401 F.2d at 384 n.27.

Third, the exercise of jurisdiction is not reasonable, the final element of the *Southern Machine* test, 401 F.2d at 381, because of the insubstantial connection between Ferrostaal and Tennessee. Where international defendants are involved, courts must "exercise restraint in extending our notions of personal jurisdiction into the international field." *Int'l Techs.*, 107 F.3d at 388. Extensions of jurisdiction may harm the forum by discouraging international investment. *See id.* at 394. Ferrostaal structured this contract to avoid jurisdiction in Tennessee and a subsequent contract between the parties should not undo that choice.

SunCoke cannot ride the 2001 contract claim into court on the coattails of the 2005 settlement contract claim. Such "pendent personal jurisdiction" has been sparingly permitted in federal diversity cases,[2] and the district court has discretion whether or not to exercise it, *Oetiker v. Jurid Werke, G. m. b. H.*, 556 F.2d 1, 5 (D.C. Cir. 1977). Application of the doctrine requires a common nucleus of operative fact between the claims, *see, e.g.*, *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002), but

---

[2]"Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180-81 (9th Cir. 2004).

there is not a common nucleus here. SunCoke's claims are factually distinct: For the 2001 contract claim, SunCoke must show that Ferrostaal misappropriated confidential documents in Brazil, constituting a breach. For the 2005 settlement contract claim, SunCoke must show that there was a settlement contract, that one of the terms of the contract guaranteed that multiple SunCoke employees could visit Ferrostaal's headquarters, and that Ferrostaal's actions repudiated the agreement, constituting a breach. Trial efficiency is not necessarily aided by trying these two claims together, because they arise out of separate occurrences. Regardless, even if these claims did arise from a common nucleus, the proper course of action would be to remand to the district court so that it may, in its discretion, "decide whether to retain or dismiss" the pendent claims. *Action Embroidery*, 368 F.3d at 1181.

Prudential concerns for efficiency should not overwhelm the larger policy issues that arise if personal jurisdiction is found here. If the parties had not reached a settlement agreement, *Nationwide* would preclude using the settlement talks as a contact for personal jurisdiction. The successful creation of a settlement agreement should not eviscerate this holding, as it would create a disincentive to settle. Furthermore, because it is unclear whether a settlement contract was formed, the 2005 settlement contract claim could be dismissed. If that occurs, Ferrostaal would be in federal court only on the 2001 contract claim, over which there is no personal jurisdiction. Such precedent creates an opportunity for gamesmanship by future plaintiffs, who could always assert a "settlement contract" in their complaint. That result would gut the holding of *Nationwide*.

The 2001 contract claim should be dismissed for lack of personal jurisdiction and the case remanded to the district court to determine whether the 2005 settlement contract claim alone satisfies the amount-in-controversy requirement.